# LAURITZEN *v.* LARSEN.

No. 226. Argued January 6, 1953.—Decided May 25, 1953.

*James M. Estabrook* argued the cause for petitioner. With him on the brief was *David P. H. Watson.*

*George Halpern* and *Richard M. Cantor* argued the cause and filed a brief for respondent.

Briefs of *amici curiae* supporting petitioner were filed by *John Lord O'Brian* for the Royal Danish Government; and *James S. Hemingway* for Skibsfartens Arbeidsgiverforening.

Briefs of *amici curiae* urging affirmance were filed by *Harry D. Graham* for Pedersen et al.; *Mr. Cantor* and *Mr. Halpern* for the Seafarers International Union of North America et al.; *Silas Blake Axtell* for the Friends of Andrew Furuseth Legislative Association; and *Jacob Rassner* for the Seamen's Union of Panama.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The key issue in this case is whether statutes of the United States should be applied to this claim of maritime tort. Larsen, a Danish seaman, while temporarily in New York joined the crew of the *Randa*, a ship of Danish flag and registry, owned by petitioner, a Danish citizen. Larsen signed ship's articles, written in Danish, providing that the rights of crew members would be governed by Danish law and by the employer's contract with the Danish Seamen's Union, of which Larsen was a member. He was negligently injured aboard the *Randa* in the course of employment, while in Havana harbor.

Respondent brought suit under the Jones Act[1] on the law side of the District Court for the Southern District of New York and demanded a jury. Petitioner contended that Danish law was applicable and that, under it, respondent had received all of the compensation to which he was entitled. He also contested the court's jurisdiction. Entertaining the cause, the court ruled that American rather than Danish law applied, and the jury rendered a verdict of $4,267.50. The Court of Appeals, Second Circuit, affirmed.[2] Its decision, at least superficially, is at variance with its own earlier ones[3] and

---

[1] "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply . . . ." 46 U. S. C. § 688.

[2] 196 F. 2d 220.

[3] In *The Paula,* 91 F. 2d 1001, the then Circuit Court of Appeals, Second Circuit, held the Jones Act inapplicable to a suit by an alien seaman against this same petitioner, and expressly refused to follow dicta by the Fifth Circuit Court of Appeals in *Arthur* v. *Compagnie Generale Transatlantique,* 72 F. 2d 662, to the effect that the Act

574

conflicts with one by the New York Court of Appeals.[4]
We granted certiorari.[5]

The question of jurisdiction is shortly answered. A
suit to recover damages under the Jones Act is *in per-
sonam* against the ship's owner and not one *in rem* against
the ship itself.[6] The defendant appeared generally,
answered and tendered no objection to jurisdiction of

gave a right of action to "all seamen regardless of nationality."
The *Paula* decision is generally consistent with prior decisions of
the court rendering it. See *The Hanna Nielsen,* 273 F. 171; *The
Pinar Del Rio,* 16 F. 2d 984, aff'd 277 U. S. 151. A few years later,
in *Gambera* v. *Bergoty,* 132 F. 2d 414, that same court granted relief
under the Jones Act to a plaintiff who was a long-time resident,
though not a citizen, of this country, and who suffered injury in
American territorial waters while serving on a Greek ship. In *Kyria-
kos* v. *Goulandris,* 151 F. 2d 132, the court (over the dissent of Judge
Learned Hand) held that the Act applied to injuries sustained while
ashore in the United States by a Greek seaman employed by a
Greek shipowner. In *O'Neill* v. *Cunard White Star,* 160 F. 2d 446,
that court held that a British seaman injured on a British vessel
on the high seas could not sue under the Jones Act. In *Taylor* v.
*Atlantic Maritime Co.,* 179 F. 2d 597, it reversed a district court
judgment dismissing a Jones Act suit by a Panamanian citizen,
allegedly residing in New York, against a ship of Panamanian
registry for injuries apparently received on the high seas. Judge
Learned Hand, writing for the court, indicated that a majority of the
panel thought that the Jones Act was not applicable to alien seamen,
but that "in spite of what we should hold, were we free" they were
bound by the decision in *Kyriakos.* In the case now before us the
court affirmed *per curiam* on the authority of *Kyriakos* and *Taylor.*
No two of these cases present exactly the same basis for application
of American law and their contrary results do not necessarily mean
inconsistency. But they illustrate different considerations which
influence choice of law in maritime tort cases.

[4] *Sonnesen* v. *Panama Transport Co.,* 298 N. Y. 262, 82 N. E. 2d
569. Such a conflict can arise because Jones Act suits may be brought
in state as well as federal courts. *Engel* v. *Davenport,* 271 U. S. 33.

[5] 344 U. S. 810.

[6] See *Plamals* v. *Pinar Del Rio,* 277 U. S. 151.

his person. As frequently happens, a contention that there is some barrier to granting plaintiff's claim is cast in terms of an exception to jurisdiction of subject matter. A cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact. Cf. *Montana-Dakota Co.* v. *Public Service Co.*, 341 U. S. 246, 249.

Denmark has enacted a comprehensive code to govern the relations of her shipowners to her seagoing labor which by its terms and intentions controls this claim. Though it is not for us to decide, it is plausibly contended that all obligations of the owner growing out of Danish law have been performed or tendered to this seaman. The shipowner, supported here by the Danish Government, asserts that the Danish law supplies the full measure of his obligation and that maritime usage and international law as accepted by the United States exclude the application of our incompatible statute.

That allowance of an additional remedy under our Jones Act would sharply conflict with the policy and letter of Danish law is plain from a general comparison of the two systems of dealing with shipboard accidents. Both assure the ill or injured seafaring worker the conventional maintenance and cure at the shipowner's cost, regardless of fault or negligence on the part of anyone. But, while we limit this to the period within which maximum possible cure can be effected, *Farrell* v. *United States*, 336 U. S. 511, the Danish law limits it to a fixed period of twelve weeks, and the monetary measurement is different. The two systems are in sharpest conflict as to treatment of claims for disability, partial or complete, which are permanent, or which outlast the liability for maintenance and cure, to which class this claim belongs. Such injuries Danish law relieves under a state-operated plan similar to our workmen's compensa-

tion systems. Claims for such disability are not made against the owner but against the state's Directorate of Insurance Against the Consequences of Accidents. They may be presented directly or through any Danish Consulate. They are allowed by administrative action, not by litigation, and depend not upon fault or negligence but only on the fact of injury and the extent of disability. Our own law, apart from indemnity for injury caused by the ship's unseaworthiness, makes no such compensation for such disability in the absence of fault or negligence. But, when such fault or negligence is established by litigation, it allows recovery for elements such as pain and suffering not compensated under Danish law and lets the damages be fixed by jury. In this case, since negligence was found, United States law permits a larger recovery than Danish law. If the same injury were sustained but negligence was absent or not provable, the Danish law would appear to provide compensation where ours would not.

Respondent does not deny that Danish law is applicable to his case. The contention as stated in his brief is rather that "A claimant may select whatever forum he desires and receive the benefits resulting from such choice" and "A ship owner is liable under the laws of the forum where he does business as well as in his own country." This contention that the Jones Act provides an optional cumulative remedy is not based on any explicit terms of the Act, which makes no provision for cases in which remedies have been obtained or are obtainable under foreign law. Rather he relies upon the literal catholicity of its terminology. If read literally, Congress has conferred an American right of action which requires nothing more than that plaintiff be "any seaman who shall suffer personal injury in the course of his employment." It makes no explicit requirement that either

the seaman, the employment or the injury have the slightest connection with the United States. Unless some relationship of one or more of these to our national interest is implied, Congress has extended our law and opened our courts to all alien seafaring men injured anywhere in the world in service of watercraft of every foreign nation— a hand on a Chinese junk, never outside Chinese waters, would not be beyond its literal wording.

But Congress in 1920 wrote these all-comprehending words, not on a clean slate, but as a postscript to a long series of enactments governing shipping. All were enacted with regard to a seasoned body of maritime law developed by the experience of American courts long accustomed to dealing with admiralty problems in reconciling our own with foreign interests and in accommodating the reach of our own laws to those of other maritime nations.

The shipping laws of the United States, set forth in Title 46 of the United States Code, comprise a patchwork of separate enactments, some tracing far back in our history and many designed for particular emergencies. While some have been specific in application to foreign shipping and others in being confined to American shipping, many give no evidence that Congress addressed itself to their foreign application and are in general terms which leave their application to be judicially determined from context and circumstance. By usage as old as the Nation, such statutes have been construed to apply only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law. Thus, in *United States* v. *Palmer,* 3 Wheat. 610, this Court was called upon to interpret a statute of 1790 (1 Stat. 115) punishing certain acts when committed on the high seas by "any person or persons," terms which, as Mr. Chief Justice Marshall observed, are

"broad enough to comprehend every human being." But the Court determined that the literal universality of the prohibition "must not only be limited to cases within the jurisdiction of the state, but also to those objects to which the legislature intended to apply them" (p. 631) and therefore would not reach a person performing the proscribed acts aboard the ship of a foreign state on the high seas.

This doctrine of construction is in accord with the long-heeded admonition of Mr. Chief Justice Marshall that "an act of congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ." *The Charming Betsy,* 2 Cranch 64, 118. See *The Nereide,* 9 Cranch 388, 423; *MacLeod* v. *United States,* 229 U. S. 416, 434; *Sandberg* v. *McDonald,* 248 U. S. 185, 195. And it has long been accepted in maritime jurisprudence that ". . . if any construction otherwise be possible, an Act will not be construed as applying to foreigners in respect to acts done by them outside the dominions of the sovereign power enacting. That is a rule based on international law by which one sovereign power is bound to respect the subjects and the rights of all other sovereign powers outside its own territory." Lord Russell of Killowen in *The Queen* v. *Jameson,* [1896] 2 Q. B. 425, 430. This is not, as sometimes is implied, any impairment of our own sovereignty, or limitation of the power of Congress. "The law of the sea," we have had occasion to observe, "is in a peculiar sense an international law, but application of its specific rules depends upon acceptance by the United States." *Farrell* v. *United States,* 336 U. S. 511, 517. On the contrary, we are simply dealing with a problem of statutory construction rather commonplace in a federal system by which courts often have to decide whether "any" or "every" reaches to the limits of the enacting

authority's usual scope or is to be applied to foreign events or transactions.[7]

The history of the statute before us begins with the 1915 enactment of the comprehensive LaFollette Act, entitled, "An Act To promote the welfare of American seamen in the merchant marine of the United States; to abolish arrest and imprisonment as a penalty for desertion and to secure the abrogation of treaty provisions in relation thereto; and to promote safety at sea." 38 Stat. 1164. Many sections of this Act were in terms or by obvious implication restricted to American ships.[8] Three

---

[7] Cheatham and Reese, Choice of the Applicable Law, 52 Col. L. Rev. 959, 961, dealing with state statutes, puts the problem in this fashion:

"There is one rule or policy which, wherever applicable, takes precedence over others and, to a large extent, saves the courts from further pain of decision. That controlling policy, obvious as it may be, is that a court must follow the dictates of its own legislature to the extent that these are constitutional. But, although choice of law constitutes no exception to this fundamental rule, rarely can the principle be applied in practice. The vast run of statutes are enacted with only the intrastate situation in mind. The application of a statute to out-of-state occurrences, therefore, must generally be determined in accordance with ordinary conflict of laws rules. And this is so even if, as is frequently the case, the statute employs such sweeping terms as 'every contract' or 'every decedent.' Unless it appears that the draftsmen so intended, language of this sort is not to be taken literally to mean that the statute is applicable to every transaction wherever occurring or to every case brought in the forum. Where, on the other hand, it is clear that the legislature has actually addressed itself to the choice of law problem, the courts, subject to the limitation of constitutionality, must give effect to its intentions."

[8] Section 1, requiring lost seamen to be replaced, directed the master to report such replacement to the United States consul at the first port at which he shall arrive thereafter. Section 2 provided certain regulations affecting the duties of crew members aboard "all merchant vessels of the United States." Section 5 provided that on complaint of the officers or crew of "any vessel" in a foreign port

sections were made specifically applicable to foreign vessels,[9] and these provoked considerable doubt and debate.[10] Others were phrased in terms which on their face might apply to the world or to anything less. In this category fell § 20, a cryptic paragraph dealing with the fellow-servant doctrine, to which this Court ascribed little, if any, of its intended effect. *Chelentis* v. *Luckenbach S. S. Co.*, 247 U. S. 372. In 1920, Congress, under the title "An Act To provide for the promotion and maintenance of the American merchant marine . . . ." and other subjects not relevant, provided a plan to aid our mercan-

that the vessel is unseaworthy or inadequately provisioned "the consul" may appoint someone to make inquiry. Section 6 set forth certain sanitation requirements for "merchant vessels of the United States." Section 13 required every vessel to have in its complement a minimum percentage of able-bodied seamen certified by the Secretary of Commerce. Section 19 was concerned with the procedure to be followed before American consuls abroad in certain matters involving American seamen.

[9] §§ 4, 11, and 14. Section 4 gave seamen the right to demand certain wage payments on coming into port. Its closing portion provided ". . . this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement." Section 11 re-enacted, with some changes, an 1898 statute prohibiting payment of advance wages to seamen; one subsection stated "this section shall apply as well to foreign vessels while in waters of the United States, as to vessels of the United States, and any master, owner, consignee, or agent of any foreign vessel who has violated its provisions shall be liable to the same penalty that the master, owner, or agent of a vessel of the United States would be for similar violation."

For construction of these two sections see *Patterson* v. *Bark Eudora*, 190 U. S. 169; *Sandberg* v. *McDonald*, 248 U. S. 185, and *Strathearn S. S. Co.* v. *Dillon*, 252 U. S. 348.

Section 14 directed that certain requirements concerning lifeboats should also be applicable to foreign vessels leaving United States ports.

[10] See Report of the House Committee on Merchant Marine and Fisheries, H. R. Rep. No. 852, 63d Cong., 2d Sess., pp. 18, 20; 50 Cong. Rec. 5761–5792.

tile fleet and included the revised provision for injured seamen now before us for construction. 41 Stat. 988, 1007. It did so by reference to the Federal Employers' Liability Act, which we have held not applicable to an American citizen's injury sustained in Canada while in service of an American employer. *New York Central R. Co.* v. *Chisholm,* 268 U. S. 29. And it did not give the seaman the one really effective security for a claim against a foreign owner, a maritime lien.[11]

Congress could not have been unaware of the necessity of construction imposed upon courts by such generality of language and was well warned that in the absence of more definite directions than are contained in the Jones Act it would be applied by the courts to foreign events, foreign ships and foreign seamen only in accordance with the usual doctrine and practices of maritime law.

Respondent places great stress upon the assertion that petitioner's commerce and contacts with the ports of the United States are frequent and regular, as the basis for applying our statutes to incidents aboard his ships. But the virtue and utility of sea-borne commerce lies in its frequent and important contacts with more than one country. If, to serve some immediate interest, the courts of each were to exploit every such contact to the limit of its power, it is not difficult to see that a multiplicity of conflicting and overlapping burdens would blight international carriage by sea. Hence, courts of this and other commercial nations have generally deferred to a nonnational or international maritime law of impressive maturity and universality.[12] It has the force of law, not

---

[11] *Plamals* v. *Pinar Del Rio,* n. 6, *supra.*

[12] See the famous opinion of Mr. Justice Story in *De Lovio* v. *Boit,* Fed. Cas. No. 3,776, 2 Gall. 398; *The Sally,* 8 Cranch 382 and 2 Cranch 406; *The Scotia,* 14 Wall. 170; Dickinson, The Law of Nations as Part of the National Law of the United States, 101 U. of Pa. L. Rev. 26, 28–29, 792, 803–816.

from extraterritorial reach of national laws, nor from abdication of its sovereign powers by any nation, but from acceptance by common consent of civilized communities of rules designed to foster amicable and workable commercial relations.

International or maritime law in such matters as this does not seek uniformity and does not purport to restrict any nation from making and altering its laws to govern its own shipping and territory. However, it aims at stability and order through usages which considerations of comity, reciprocity and long-range interest have developed to define the domain which each nation will claim as its own. Maritime law, like our municipal law, has attempted to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved. The criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority. It would not be candid to claim that our courts have arrived at satisfactory standards or apply those that they profess with perfect consistency. But in dealing with international commerce we cannot be unmindful of the necessity for mutual forbearance if retaliations are to be avoided; nor should we forget that any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction.

In the case before us, two foreign nations can claim some connecting factor with this tort—Denmark, because, among other reasons, the ship and the seaman were Danish nationals; Cuba, because the tortious conduct occurred and caused injury in Cuban waters. The United States may also claim contacts because the seaman had

been hired in and was returned to the United States, which also is the state of the forum. We therefore review the several factors which, alone or in combination, are generally conceded to influence choice of law to govern a tort claim, particularly a maritime tort claim, and the weight and significance accorded them.

1. *Place of the Wrongful Act.*—The solution most commonly accepted as to torts in our municipal and in international law is to apply the law of the place where the acts giving rise to the liability occurred, the *lex loci delicti commissi*.[13] This rule of locality, often applied to maritime torts,[14] would indicate application of the law of Cuba, in whose domain the actionable wrong took place. The test of location of the wrongful act or omission, however sufficient for torts ashore, is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate. These range from ports, harbors, roadsteads, straits, rivers and canals which form part of the domain of various states, through bays and gulfs, and that band of the littoral sea known as territorial waters, over which control in a large, but not unlimited, degree is conceded to the adjacent state. It includes, of course, the high seas as to which the law was probably settled and old when Grotius wrote that it cannot be anyone's property and cannot be monopolized by virtue of discovery, occupation, papal grant, prescription or custom.[15]

---

[13] See *Slater* v. *Mexican National R. Co.*, 194 U. S. 120; *New York Central R. Co.* v. *Chisholm*, 268 U. S. 29; Rheinstein, The Place of Wrong, 19 Tulane L. Rev. 4, 165; cf. *Sandberg* v. *McDonald*, 248 U. S. 185, 195.

[14] *Carr* v. *Fracis Times & Co.*, [1902] A. C. 176; cf. *Uravic* v. *Jarka Co.*, 282 U. S. 234. See Restatement, Conflict of Laws, § 404.

[15] Grotius, De Jure Praedae, Carnegie Endowment Publication 1950, 207, 220, 222, 223, 231–233, 234, 237. See Dumbauld, Grotius on the Law of Prize, 1 J. Pub. L. 370, 372, 387.

We have sometimes uncompromisingly asserted territorial rights, as when we held that foreign ships voluntarily entering our waters become subject to our prohibition laws and other laws as well, except as we may in pursuance of our own policy forego or limit exertion of our power.  *Cunard Steamship Co.* v. *Mellon,* 262 U. S. 100, 124.  This doctrine would seem to indicate Cuban law for this case.  But the territorial standard is so unfitted to an enterprise conducted under many territorial rules and under none that it usually is modified by the more constant law of the flag.  This would appear to be consistent with the practice of Cuba, which applies a workmen's compensation system in principle not unlike that of Denmark to all accidents occurring aboard ships of Cuban registry.[16]  The locality test, for what it is worth, affords no support for the application of American law in this case and probably refers us to Danish in preference to Cuban law, though this point we need not decide, for neither party urges Cuban law as controlling.

2. *Law of the Flag.*—Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag.  Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it.  Nationality is evidenced to the world by the ship's papers and its flag. The United States has firmly and successfully maintained that the regularity and validity of a registration can be questioned only by the registering state.[17]

---

[16] See Cuba Workmen's Compensation Law, Decree No. 2687, November 15, 1933, Arts. XI, XL.

[17] The leading case is *The Virginius,* seized in 1873 by the Spanish when en route to Cuba.  President Grant took the position that "if the ship's papers were irregular or fraudulent, the crime was committed against the American laws and only its tribunals were

This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship, because it "is deemed to be a part of the territory of that sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty." On this principle, we concede a territorial government involved only concurrent jurisdiction of offenses aboard our ships. *United States* v. *Flores,* 289 U. S. 137, 155–159, and cases cited. Some authorities reject, as a rather mischievous fiction, the doctrine that a ship is constructively a floating part of the flag-state,[18] but apply the law of the flag on the pragmatic basis that there must be some law on shipboard, that it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns her.

It is significant to us here that the weight given to the ensign overbears most other connecting events in determining applicable law. As this Court held in *United States* v. *Flores, supra,* at 158, and iterated in *Cunard Steamship Co.* v. *Mellon, supra,* at 123:

"And so by comity it came to be generally understood among civilized nations that all matters of discipline and all things done on board which affected only the vessel or those belonging to her, and did not involve the peace or dignity of the country, or the

competent to decide the question." The Attorney General took the same position. The ship was restored. 2 Moore's Digest 895–903. Higgins and Colombos, International Law of the Sea (2d ed.), 201.

[18] The theoretical basis used by this Court apparently prevailed in 1928 with the Permanent Court of International Justice in the case of *The Lotus,* P. C. I. J., Series A, No. 10. For criticism of it see Higgins and Colombos, International Law of the Sea (2d ed.), 193–195. We leave the controversy where we find it, for either basis leads to the same result in this case, though this might not be so with some other problems of shipping.

tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation or the interests of its commerce should require. . . ."

This was but a repetition of settled American doctrine.[19]

These considerations are of such weight in favor of Danish and against American law in this case that it must prevail unless some heavy counterweight appears.

3. *Allegiance or Domicile of the Injured.*—Until recent times there was little occasion for conflict between the law of the flag and the law of the state of which the seafarer was a subject, for the long-standing rule, as pronounced by this Court after exhaustive review of authority, was that the nationality of the vessel for jurisdictional purposes was attributed to all her crew. *In re Ross,* 140 U. S. 453, 472.[20] Surely during service under a foreign flag some duty of allegiance is due. But, also, each nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support. In some later American cases, courts have been prompted to apply the Jones Act by the fact that the wrongful act or omission alleged caused injury to an American citizen or domiciliary.[21] We need not, however, weigh the seaman's nationality against that of the ship, for here the two coincide without resort to fiction. Ad-

---

[19] *Wildenhus's Case,* 120 U. S. 1; *Brown* v. *Duchesne,* 19 How. 183. For application of this doctrine in tort cases see *Bonsalem* v. *Byron S. S. Co.,* 50 F. 2d 114; *Cain* v. *Alpha S. S. Corp.,* 35 F. 2d 717; *Grand Trunk R. Co.* v. *Wright,* 21 F. 2d 814; Restatement, Conflict of Laws, § 405.

[20] See also *Rainey* v. *New York & P. S. S. Co.,* 216 F. 449.

[21] See *Uravic* v. *Jarka Co., supra; Shorter* v. *Bermuda & West Indies S. S. Co.,* 57 F. 2d 313; *Gambera* v. *Bergoty,* 132 F. 2d 414. But see *The Oriskany,* 3 F. Supp. 805; *Clark* v. *Montezuma Transportation Co.,* 217 App. Div. 172, 216 N. Y. Supp. 295.

mittedly, respondent is neither citizen nor resident of the United States. While on direct examination he answered leading questions that he was living in New York when he joined the *Randa,* the articles which he signed recited, and on cross-examination he admitted, that his home was Silkeburg, Denmark. His presence in New York was transitory and created no such national interest in, or duty toward, him as to justify intervention of the law of one state on the shipboard of another.

4. *Allegiance of the Defendant Shipowner.*—A state "is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed." *Skiriotes* v. *Florida,* 313 U. S. 69, 73. *Steele* v. *Bulova Watch Co.,* 344 U. S. 280, 282. Until recent times this factor was not a frequent occasion of conflict, for the nationality of the ship was that of its owners.[22] But it is common knowledge that in recent years a practice has grown, particularly among American shipowners, to avoid stringent shipping laws by seeking foreign registration eagerly offered by some countries.[23] Confronted with such operations, our courts on occasion have pressed beyond the formalities of more or less nominal foreign registration to enforce against American shipowners the obligations which our law places upon them.[24] But here again the

---

[22] Many nations (including both the United States and Denmark) still allow only those ships wholly or predominantly owned by its nationals to register under its flag. See 46 U. S. C. §§ 11, 808; Denmark, Maritime Law of May 7, 1937, § 1.

[23] McFee, The Law of the Sea, 152–154. See Merchant Marine Study and Investigation (Transfer of American Ships to Foreign Registry), Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 81st Cong., 1st Sess.

[24] See *Gerradin* v. *United Fruit Co.,* 60 F. 2d 927; cf. *Central Vermont Co.* v. *Durning,* 294 U. S. 33.

utmost liberality in disregard of formality does not support the application of American law in this case, for it appears beyond doubt that this owner is a Dane by nationality and domicile.

5. *Place of Contract.*—Place of contract, which was New York, is the factor on which respondent chiefly relies to invoke American law. It is one which often has significance in choice of law in a contract action. But a Jones Act suit is for tort, in which respect it differs from one to enforce liability for maintenance and cure. As we have said of the latter, "In the United States this obligation has been recognized consistently as an implied provision in contracts of marine employment. Created thus with the contract of employment, the liability, unlike that for indemnity or that later created by the Jones Act, in no sense is predicated on the fault or negligence of the shipowner." *Aguilar* v. *Standard Oil Co.,* 318 U. S. 724, 730. *De Zon* v. *American President Lines,* 318 U. S. 660, 667; *Calmar S. S. Corp.* v. *Taylor,* 303 U. S. 525, 527. But this action does not seek to recover anything due under the contract or damages for its breach.

The place of contracting in this instance, as is usual to such contracts, was fortuitous. A seaman takes his employment, like his fun, where he finds it; a ship takes on crew in any port where it needs them. The practical effect of making the *lex loci contractus* govern all tort claims during the service would be to subject a ship to a multitude of systems of law, to put some of the crew in a more advantageous position than others, and not unlikely in the long run to diminish hirings in ports of countries that take best care of their seamen.

But if contract law is nonetheless to be considered, we face the fact that this contract was explicit that the Danish law and the contract with the Danish union were to control. Except as forbidden by some public policy,

the tendency of the law is to apply in contract matters the law which the parties intended to apply.[25]   We are aware of no public policy that would prevent the parties to this contract, which contemplates performance in a multitude of territorial jurisdictions and on the high seas, from so settling upon the law of the flag-state as their governing code.   This arrangement is so natural and compatible with the policy of the law that even in the absence of an express provision it would probably have been implied.   *The Belgenland,* 114 U. S. 355, 367; *The Hanna Nielsen,* 273 F. 171.   We think a quite different result would follow if the contract attempted to avoid applicable law, for example, so as to apply foreign law to an American ship.

However, at the same time that he is relying on the place of the contract, respondent attacks the whole contract as void because the articles do not describe the voyage with sufficient definiteness within the rule applied in *The Quoque,* 261 F. 414, aff'd 266 F. 696.   This case dealt with an American ship and its holding was founded upon a statute originally enacted in 1873 and held by those courts that have dealt with the problem applicable only to American ships.   *The Montapedia,* 14 F. 427; *The Elswick Tower,* 241 F. 706.   The contention is without merit.

We do not think the place of contract is a substantial influence in the choice between competing laws to govern a maritime tort.

6. *Inaccessibility of Foreign Forum.*—It is argued, and particularly stressed by an *amicus* brief, that justice requires adjudication under American law to save seamen expense and loss of time in returning to a foreign forum. This might be a persuasive argument for exercising a dis-

---

[25] See Yntema, "Autonomy" in Choice of Law, 1 Am. J. Comp. L. 341.

cretionary jurisdiction to adjudge a controversy; but it is not persuasive as to the law by which it shall be judged. It is pointed out, however, that the statutes of at least one maritime country (Panama) allow suit under its law by injured seamen only in its own courts. The effect of such a provision is doubtful in view of our holding that such venue restrictions by one of the states of the Union will not preclude action in a sister state, *Tennessee Coal, Iron & R. Co.* v. *George,* 233 U. S. 354.

Confining ourselves to the case in hand, we do not find this seaman disadvantaged in obtaining his remedy under Danish law from being in New York instead of Denmark. The Danish compensation system does not necessitate delayed, prolonged, expensive and uncertain litigation. It is stipulated in this case that claims may be made through the Danish Consulate. There is not the slightest showing that to obtain any relief to which he is entitled under Danish law would require his presence in Denmark or necessitate his leaving New York. And, even if it were so, the record indicates that he was offered and declined free transportation to Denmark by petitioner.

7. *The Law of the Forum.*—It is urged that, since an American forum has perfected its jurisdiction over the parties and defendant does more or less frequent and regular business within the forum state, it should apply its own law to the controversy between them. The "doing business" which is enough to warrant service of process may fall quite short of the considerations necessary to bring extraterritorial torts to judgment under our law. Under respondent's contention, all that is necessary to bring a foreign transaction between foreigners in foreign ports under American law is to be able to serve American process on the defendant. We have held it a denial of due process of law when a state of the Union attempts to draw into control of its law otherwise foreign controversies, on slight connections, because it is a forum

state. *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.*, 292 U. S. 143; *Home Insurance Co.* v. *Dick*, 281 U. S. 397. The purpose of a conflict-of-laws doctrine is to assure that a case will be treated in the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum. Jurisdiction of maritime cases in all countries is so wide and the nature of its subject matter so far-flung that there would be no justification for altering the law of a controversy just because local jurisdiction of the parties is obtainable.

It is pointed out that our statute on limitation of shipowner's liability which formerly applied in terms to "any vessel" was applied by our courts to foreign causes.[26] Hence, it is argued by analogy that "any seaman" should be construed so to apply. But the situation is inverted. The limitation-of-liability statute was construed to thus apply only against those who had chosen to sue in our courts on foreign transactions.[27] Because a

---

[26] *The Scotland*, 105 U. S. 24; *The Titanic*, 233 U. S. 718. At the time these cases were decided the statute purported to apply to "any vessel." In 1936 it was amended so as expressly to apply to foreign, as well as domestic, vessels. 49 Stat. 1479.

[27] "It is true that the act of Congress does not control or profess to control the conduct of a British ship on the high seas. See *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, 356. It is true that the foundation for a recovery upon a British tort is an obligation created by British law. But it also is true that the laws of the forum may decline altogether to enforce that obligation on the ground that it is contrary to the domestic policy, or may decline to enforce it except within such limits as it may impose. *Cuba Railroad Co.* v. *Crosby*, 222 U. S. 473, 478, 480. Dicey, Conflict of Laws, 2d ed., 647. It is competent therefore for Congress to enact that in certain matters belonging to admiralty jurisdiction parties resorting to our courts shall recover only to such extent or in such way as it may mark out. *Butler* v. *Boston & Savannah Steamship Co.*, 130 U. S. 527. The question is not whether the owner of the Titanic by this proceeding can require all claimants to come in and can cut down

592

law of the forum is applied to plaintiffs who voluntarily submit themselves to it is no argument for imposing the law of the forum upon those who do not. Furthermore, this application of the limitation on liability brought our practice into harmony with that of all other maritime nations,[28] while the application of the Jones Act here advocated would bring us into conflict with the maritime world.

This review of the connecting factors which either maritime law or our municipal law of conflicts regards as significant in determining the law applicable to a claim of actionable wrong shows an overwhelming preponderance in favor of Danish law. The parties are both Danish subjects, the events took place on a Danish ship, not within our territorial waters. Against these considerations is only the fact that the defendant was served here with process and that the plaintiff signed on in New York, where the defendant was engaged in our foreign commerce. The latter event is offset by provision of his contract that the law of Denmark should govern. We do not question the power of Congress to condition access to our ports by foreign-owned vessels upon submission to any liabilities it may consider good American policy to

rights vested under English law, as against, for instance, Englishmen living in England who do not appear. It is only whether those who do see fit to sue in this country are limited in their recovery irrespective of the English law. That they are so limited results in our opinion from the decisions of this court. For on what ground was the limitation of liability allowed in *The Scotland* or *La Bourgogne?* . . . . The essential point was that the limitation might be applied to foreign ships if sued in this country although they were not subject to our substantive law." *The Titanic, supra,* at 732–733 (per Holmes, J.).

[28] Limitation of liability has been an essential part of the maritime law of every maritime nation since the *Grand Ordonnance* of Louis XIV in 1681. See discussion in the opinion of Mr. Justice Brown in *The Main* v. *Williams,* 152 U. S. 122.

exact. But we can find no justification for interpreting the Jones Act to intervene between foreigners and their own law because of acts on a foreign ship not in our waters.

In apparent recognition of the weakness of the legal argument, a candid and brash appeal is made by respondent and by *amicus* briefs to extend the law to this situation as a means of benefiting seamen and enhancing the costs of foreign ship operation for the competitive advantage of our own. We are not sure that the interest of this foreign seaman, who is able to prove negligence, is the interest of all seamen or that his interest is that of the United States. Nor do we stop to inquire which law does whom the greater or the lesser good. The argument is misaddressed. It would be within the proprieties if addressed to Congress. Counsel familiar with the traditional attitude of this Court in maritime matters could not have intended it for us.[29]

The judgment below is reversed and the cause remanded to District Court for proceedings consistent herewith.

*Reversed and remanded.*

MR. JUSTICE BLACK agrees with the Court of Appeals and would affirm its judgment.

MR. JUSTICE CLARK, not having heard oral argument, took no part in the consideration or decision of this case.

---

[29] Cf. *The Peterhoff*, 5 Wall. 28, 57: "In cases such as that now in judgment, we administer the public law of nations, and are not at liberty to inquire what is for the particular advantage or disadvantage of our own or another country."