Georgios FIRIPIS, Libellant,

v.

THE S/S MARGARITIS, her boats, engines, etc., in rem, Southern Cross Steamship Co., Inc., a foreign corporation, as owners, operators and agents of said vessel and Hasler and Company, as agents, in personam, Respondents.

No. 7946.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 8, 1960.

ed the services of at least two men to remove from the pallet, crib or bucket, and to place in its proper location on deck to await subsequent transfer to its final destination. One Apostolos Rousketos was inside the crib and proceeded to rest the tank on the edge of the crib. Libellant was outside of the crib or wire basket and on the inboard side of the starboard deck near the No. 3 hatch. Libellant, in assisting the removal of the tank, took hold of the forward or top of the tank and, after taking a step or two, slipped and fell. According to libellant, the crew had been oiling the winches located nearby and oil had flowed upon the deck in the immediate vicinity of the crib. Libellant contends that he slipped on oil, fell forward, and the tank dropped upon his right hand resulting in serious and permanent injuries to the fifth or little finger of his right hand. Testimony presented by respondents is in contradiction to that of libellant as to the presence of oil on the deck, but it is conceded that, for some unknown cause, libellant did slip and fall.

Only the third officer (Zolotos) and the seaman in the crib (Rousketos) were produced as witnesses by respondents, although admittedly there were at least three or four other members of the crew congregated in the area. The boatswain (Mathioudis), in charge of the unloading operation, was not called as a witness although the file reflects that libellant endeavored unsuccessfully to take the deposition of the boatswain and another witness on February 9, 1959, at New York; the notice to take depositions referring to these individuals as "former crew members." One seaman (Kostantinidas) was no longer a member of the crew when respondents' depositions were taken approximately nine months after the accident. The chief engineer was present at the scene but was not called upon to testify in the case. Other unidentified members of the deck department were also engaged in unloading shipstores in the vicinity of the accident.

Sidney H. Kelsey, Norfolk, Va., Amato, Babalas, Breit & Cohen, Peter K. Babalas, Norfolk, Va., for libellant.

Vandeventer, Black, Meredith & Martin, Walter B. Martin, Jr., Norfolk, Va., for respondents.

WALTER E. HOFFMAN, District Judge.

Libellant, an A/B seaman employed on the S. S. Margaritis, was injured on April 1, 1958, while the vessel was in drydock for minor repairs at Norfolk, Virginia. The accident occurred at approximately 3 P.M. while libellant was assisting in moving an oxygen tank from a pallet or crib which had brought the tank and other shipstore supplies from the dock to the deck of the vessel. The tank, weighing about 120 pounds, requir-

The unexplained failure to call material witnesses raises an inference

that such witnesses, if permitted to testify, would not support the defense as advanced by respondents. With the exceptions, as noted, the witnesses presumably were in the employ of the respondent owner at the time respondents' depositions were taken. When we consider the fact that the libel was filed approximately two weeks following the accident, and the evidence further discloses that proctors for respondents interviewed certain crew members at Norfolk about three months after the accident, we believe it to be a fair assumption that some of the other witnesses were better situated to state facts which would assist the Court in determining the cause of libellant's fall. The positive testimony of libellant is to the effect that the crew had previously been engaged on the day in question in oiling the winches located from six to ten feet distant from the place where libellant fell. The oiling of winches would come within the supervision of the boatswain. Even more significant it should be noted that the third officer was situated on the outboard side of the starboard deck, and that the seaman in the crib, as well as the crib or basket itself, were between the third officer and the libellant. In explanation of his testimony that no oil was upon the deck in the area in question, the third officer stated that he had noted the condition of the deck about fifteen minutes prior thereto and, after some persuasion by proctor for respondent, he further stated that men were working in the area and he had wanted to see that the area was clean before bringing any provisions aboard. As to the seaman in the crib, basket, or bucket, the evidence as to the absence of oil on the deck is of a negative character and, additionally, his testimony is to the effect that he was in the crib, the sides of which slanted away from the witness, placing this witness in a not too advantageous position to describe the condition of the deck. When all of these factors are considered, along with the proper inferences to be drawn from the attitude of respondent in refusing to pay maintenance at a time when libellant had obviously not reached his maximum

cure, we think it plain that libellant has carried the burden of proof in establishing that the immediate cause of his fall was due to oil upon the deck in the area.

The libellant is a citizen of Greece. Approximately one year prior to his injury libellant signed an employment contract in Piraeus, Greece, and immediately flew to Alexandria, Egypt, where he originally signed aboard the S. S. Margaritis on or about April 6, 1957. The vessel is owned by the respondent, Southern Cross Steamship Company, Inc. a corporation organized and existing under the laws of the Republic of Liberia, having been so formulated on December 3, 1953. At the time of the injury the corporate stock was owned by Greek citizens, with the exception of 20% of said stock which was owned by an American citizen. In January, 1959, approximately eight months after the institution of this action, the American citizen sold his stock interest to the Greek citizens. Respondent's principal office is listed as Monrovia, Liberia. Southern Cross Steamship Company, Inc., maintained no office, and employed no persons, in the Republic of Honduras, although the Margaritis flew the flag of that country. Operating instructions for the vessel were issued in part by the Greek citizens, and in part by the American stockholder. No operating instructions emanated from the Republic of Honduras. The vessel never visited Honduras on any voyage. She was purchased by, and delivered to, Southern Cross Steamship Company, Inc., on January 21, 1954, at LeHarve, France.

For a period of two years prior to the accident the vessel participated in thirteen voyages; nine of which involved visits to ports in the United States. At no time did the vessel visit Greece, Liberia or Honduras.

The libel, as amended, states a cause of action under the Jones Act, 46 U.S. C.A. § 688, for negligence, and further asserts a claim for unseaworthiness under general maritime law. It is further contended that wages were not paid to libellant in a port of the United States

pursuant to 46 U.S.C.A. §§ 596, 597. A claim for maintenance and wages to the end of the voyage is likewise asserted in a separate cause of action.

We turn to a consideration of the right to maintain this action as alleged by libellant. Respondent insists that, as to the claim for damages, libellant must resort to the law of Honduras covering compensation for accidents arising from maritime work. If this law is applicable to the facts of this case, compensation equivalent to two-thirds of libellant's weekly wage would be payable for seven weeks covering the "loss" of the little finger. Under Article 53, the rights granted to the injured maritime worker against the master or vessel are exclusive. Libellant last signed Honduran articles on March 13, 1958, apparently at Bremen, Germany, which said articles were not validated until the vessel reached New York. The articles do not describe the voyage or voyages to be undertaken, but do include a reference to any remedy for injury as being exclusively governed by the laws of the Republic of Honduras.

That the S. S. Margaritis is a "flag of convenience" cannot be doubted. A Liberian corporation, controlled by Greek and American interests as indicated, operated a vessel under the Honduran flag, which said vessel never visited Liberia, Greece, or Honduras. The contacts are essentially in the United States with a general agent in New York. Libellant's injuries occurred while the vessel was in drydock in the United States. Accepting the most recent pronouncements on the subject as stated in Bartholomew v. Universe Tankships, Inc., 2 Cir., 263 F.2d 437, certiorari denied 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030, we believe that the total lack of contacts with Honduras, save and except the flying of the Honduran flag, precludes us from applying the law of the flag to this case.[1] With no suggestion or evidence tending to show that the law of any other country should be applied, we lean to the view that substantial contacts exist between the seaman and the United States, in that the tortious conduct occurred therein, the articles were validated at New York, and orders for the operation of the vessel emanated in part from New York where a substantial stockholder maintained his residence and place of business. We are not unmindful of the teachings in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, wherein the Jones Act was held inapplicable in a case involving a Danish seaman who, while temporarily in New York, signed aboard a ship of bona fide Danish flag and registry, and was injured in the course of his employment while in the harbor of Havana. We wholeheartedly agree with Lauritzen, but it should be noted from the opinion of Mr. Justice Jackson that cases involving nominal foreign registrations are not intended to be governed by the same rules.

Holding that the Jones Act applies to this case, we think it clear that negligence existed in directing libellant to perform a duty at a place not reasonably safe at the time, without at least directing libellant's attention to the presence of oil on the deck. There is credible evidence to support the view that defendant's officers or crew members should, by the exercise of ordinary care, have noted the presence of oil on the deck in sufficient time to have corrected the condition. Without a more definitive pronouncement on the subject, it cannot be said that this transitory condition is tantamount to unseaworthiness. Cf. Mitchell v. Trawler Racer, Inc., 1 Cir., 265 F.2d 426, certiorari granted 361 U.S. 808, 80 S.Ct. 70, 4 L.Ed.2d 57, argued January 21, 1960, 80 S.Ct. 926.

---

1. We note that the law of Honduras, as submitted in this case, only precludes an action in behalf of an injured seaman against the master or vessel. A suit to recover damages under the Jones Act is *in personam* against the ship's owner and not *in rem* against the ship itself. Lauritzen v. Larsen, 345 U.S. 571, 574, 73 S.Ct. 921.

The injuries were serious and painful. Initially, it appeared that libellant would have a "claw" hand, but subsequent plastic surgery treatment reduced the permanent disability to approximately five per cent of the total hand, or thirty per cent of the little finger. For his pain, suffering, inconvenience, loss of wages, and permanent injury libellant is entitled to an award of $3,500, which will be diminished by fifteen per cent for contributory negligence in failing to maintain a proper lookout for his own safety.

Libellant was confined to the United States Public Health Service Hospital at Norfolk from April 1, 1958, to May 15, 1958, and respondent paid maintenance at the rate of $6.50 per day until June 14, 1958, at which time payments were stopped. Undeniably, libellant did not reach the point of maximum cure until October 16, 1958. Eliminating the days that libellant was confined to the Norfolk General Hospital for two plastic surgery operations, respondent is obligated to pay maintenance at the rate of $6.50 per day, plus interest on the delinquent payments at the rate of six per centum per annum computed on a weekly basis. It is well settled that where maintenance payments are due and unpaid without cause, interest is properly chargeable on such payments. Medina v. Erickson, 9 Cir., 226 F.2d 475. The total payments due, including interest computed to the date of final argument on January 12, 1960, aggregate $754.49, as per stipulation of counsel. Respondent has now paid all items for medical and hospital treatment.

The claim for wages and waiting time presents a rather unique situation from the state of the evidence. The uncontradicted testimony is to the effect that a new master took charge of the vessel in Germany immediately prior to the vessel's departure for Norfolk, and that the crew was not paid their wages in full while in Germany. This is supported not only by libellant's testimony, but also by a copy of a wage account submitted by the new master to libellant while "at sea" on March 13, 1958. The wage account covers the period from August 13, 1957, to March 13, 1958. It was partially prepared in typewritten form but manifestly other writings and figures were thereafter placed upon the account in pencil. As one item listed as an advance reveals £22–10–6 paid at Hamburg and Bremen, and another item shows a payment of £50 on March 8, 1958, for "Home to Greece", we must assume that these items, shown in pencil, were added to the account after the typewritten account was initially prepared.

Respondent, relying upon the language of the wage account, urges that it discloses on its face that libellant was paid in full while "at sea" on March 13, 1958. The wage account reveals that, on that date, there was due to libellant the sum of £28–19–3. Libellant, at the time of his deposition on August 21, 1958, positively stated that he never received this money and that it was then due and owing. While the copy of the wage account indicates some writing in pencil at the bottom of the page, it cannot be said that this is the libellant's signature. Indeed, for some unknown reason, libellant was never even questioned as to whether he had received the money or signed his name indicating receipt of same. Presumably the original wage account is in the possession of respondent, but has never been produced. Such document, if produced, should readily reveal whether libellant's signature appears thereon. Respondent submitted no evidence as to libellant's claim for £28–19–3, due and unpaid on March 13, 1958, and payable on April 2, 1958, at Norfolk when the vessel departed, with libellant remaining in the hospital. As a demand for wages was made by libellant, he was entitled to this sum on April 2, 1958, and respondent advances no reason why the wages have never been paid.

Respondent's agent, Hasler and Company, paid libellant the sum of $53.54 at the U. S. Public Health Service Hospital on April 2, 1958. The receipt of this sum is admitted by libellant, and a

receipt was apparently signed by libellant (by printing his name in English). The receipt, written in English, states: "Wages due up to and including April 1st, 1958, for Wage Account Attached". Respondent's agent did not produce the attached wage account and admittedly did not deliver a copy to libellant; the original having been forwarded to the owner's agents in New York for the purpose of securing reimbursement for this expenditure. The local agent does not state that the receipt was either read or explained to libellant, and as libellant is a Greek, testifying through an interpreter, it is improbable that he knew the contents of the paper he signed. Libellant stated that he knew he had wages due him which had accrued since the wage account dated March 13, 1958, had been submitted to him, and respondent's agent testified that the sum of $53.54 covered approximately seventeen days' wages. The signing of the receipt dated April 2, 1958, affords no defense to respondent if, in fact, the wages due on March 13, 1958, remain unpaid.

Respondent's actions on the wage controversy are indeed strange. The production of a receipt for wages due on March 13, 1958 bearing libellant's signature, would put an end to this disputed issue of fact. If the wages were in fact paid "at sea" on that date, the original receipt must still be available. Even the testimony of the master, or other officer paying the wages to the crew, would have been of some assistance; but to rely merely upon a wage account bearing no identifiable signature or name affords no defense. The respondent owner has violated the statutes of the United States and is properly subjected to the waiting time provisions. Giving the shipowner the benefit of a doubt in erroneously assuming that the wages had been paid in full on April 2, 1958, there remains no excuse for this continued assumption after libellant testified on August 21, 1958. Until these wages are paid in full, respondent shall be liable under the waiting time statute for each day since August 22, 1958, plus the amount actually due.

Libellant's claim against Hasler and Company is dismissed. There is nothing that this local husbanding agent did, or failed to do, which supports any contention of legal liability. The decree will be against the vessel *in rem* and the respondent, Southern Cross Steamship Co., Inc., *in personam*. Adopting this memorandum as the Court's findings of fact and conclusions of law, pursuant to General Admiralty Rule 46½, 28 U.S.C.A., proctors for libellants will prepare and present, after inspection by proctors for respondents, an appropriate decree.