Charilaos SAMARAS

v.

THE S.S. JACOB VEROLME, her engines, boats, tackle, etc., in rem
and
Nederlandse Erts-Tanker Maats N. V., in personam.

No. 131 of 1960, Admiralty.

United States District Court
E. D. Pennsylvania.

Aug. 31, 1960.

John S. Manos, Philadelphia, Pa., for libellant.

Springer H. Moore, Jr., and T. E. Byrne, Jr., Krusen, Evans & Shaw, Philadelphia, Pa., for respondents.

VAN DUSEN, District Judge.

The libel filed April 18, 1960, claims damages for injuries caused by the alleged unseaworthiness of the vessel and the negligence of its owners and operators, which it is claimed caused libellant to fall on the ship and suffer injuries (first cause of action), damages for failure of respondents to provide prompt and adequate medical care "so as to safeguard (libellant) against aggravation and worsening of his injuries" (second cause of action), wages,[1] hospitalization pay, maintenance pay, etc., as well as the value of his personal effects and clothing allegedly improperly retained (third cause of action). Exceptions and exceptive allegations were filed to this libel which are before the court on a record consisting of answers to interrogatories (Documents Nos. 20 and 27),[2] affidavits (Documents Nos. 24–26, 28 and 29), and

1. As indicated by the reference to the deposition (Document No. 23) on page 1 of the letter of June 29 (in Document No. 32), as well as by the affidavits filed as Documents Nos. 26 and 28, it would appear that libellant received all his wages prior to leaving Panama and arriving in this country, at which time he was furnished transportation to The Netherlands where remedies to secure any wages accruing during the trip were available to him.

2. Letters of July 6 and August 18, constituting additional interrogatories and answers, are attached to this Memorandum Opinion. Since the Charterer had no responsibility for managing, manning and

the deposition of libellant (Document No. 23).

The facts, which are contained for the most part in the deposition (Document No. 23) and affidavits of June 14 with exhibits attached (Document No. 26) and of June 24 (Document No. 24), are summarized below.

In Rotterdam, The Netherlands, on August 3, 1959, libellant, Charilaos Samaras, a citizen and resident of the Kingdom of Greece, was employed by respondent shipowner to serve as a fireman on the S.S. Jacob Verolme, a vessel documented under the laws of The Netherlands, flying the Dutch flag, and owned and operated by respondent, Nederlandse Erts-Tanker Maats, a business entity wholly owned by citizens of The Netherlands (paragraphs 10 and 11 of Document No. 26). The terms of the contract of employment, which he signed at that time, provide for the application of Dutch law with respect to the relations between Samaras and his employer (see affidavit of June 24, 1960, being Document No. 24).[3]

Thereafter, Samaras and other members of the crew were transported, at the expense of the employer, by chartered plane and bus to Newport News, Virginia, where they boarded the vessel on September 14 (paragraph 14 of Document No. 26).

On or about October 15, 1959, while the vessel was on the high seas in international waters en route from Chile to Panama, Samaras sustained an accident with resulting injuries. Libellant alleges that he fractured his right hip when he slipped and fell on a wooden grating on deck. Following the injury, he was provided with first aid aboard the vessel and, upon arrival at the Canal Zone, was hospitalized at the Gorgas Hospital, Cristobal, a facility of the United States Public Health Service.

On or about March 28, 1960, the medical authorities at the Gorgas Hospital recommended his discharge.[4] Inasmuch as the S.S. Jacob Verolme was then northbound on another voyage from Chile to Philadelphia by way of the Canal Zone, Samaras was placed on board as a passenger for the first leg of his journey to Europe. A ticket was purchased and arrangements were made to have him flown from New York to Europe on April 16, 1960, the day of his arrival in Philadelphia.

However, upon the docking of the vessel at Philadelphia, at the request of Samaras and out of an abundance of caution, the vessel's Master authorized his being taken to St. Joseph's Hospital for re-examination in order to be sure that he was fit to complete the trip. Upon assurances from Dr. Walter D'Alonzo, the doctor in charge, and Dr. Richard Kaplan, an orthopedic specialist, that his condition was satisfactory and the trip to Europe would not have any adverse effects, further arrangements were made for an escort to New York and his overseas flight on April 21, 1960. The libellant refused to leave this country but retained the air transportation ticket to The Netherlands furnished by respondents, which is good for a year.

A "Bareboat Charter" of the vessel by the owner (hereinafter sometimes referred to as "Maats") to Canadian Foreign Steamship Company, Ltd., a corporation organized and existing under the laws of the Bahamas (hereinafter called "Charterer") was executed as of May 1,

supplying the vessel (see paragraph 8 of Document No. 26), the residences of the owners of its stock are not significant. It is assumed that the stock of the American companies acting as local agents for the ship is owned by residents of this country. The relevant provisions of the Bareboat Charter have been made available to libellant and, due to respondents' claim that certain immaterial provisions of it concerning, primarily, the rates of pay due to the shipowners are confidential, it has been placed in an envelope (Document No. 31) marked "only to be opened by the court."

3. Libellant's counter-affidavit (Document No. 29) alleges that this contract is not binding, but employment of libellant in The Netherlands is admitted.

4. See Exhibit D to Document No. 26.

1956 (see Document No. 31). The owners of Charterer may be citizens of the United States (see footnote 2). However, under a subsequent agreement between Maats and Charterer, Maats is "charged with the responsibility of managing, manning, supplying and victualing the vessel" (see paragraph 8 of Document No. 26).[5] Since November 1957, 27 out of a total of 30 voyages by the vessel have been between ports in South America and ports of the United States (see exhibit to supplemental answers to interrogatories, being Document No. 27).

■ A review of the "connecting factors" set forth in Lauritzen v. Larsen, 1953, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, requires the conclusion that the law of The Netherlands applies to the three causes of action stated in the libel.[6] See, also, O'Neill v. Cunard White Star, 2 Cir., 1947, 160 F.2d 446. To use the words of the court in the Lauritzen case, 345 U.S. at page 592, 73 S.Ct. at page 933, this record shows "an overwhelming preponderance in favor of" the law of The Netherlands. The libellant is a Greek subject, the respondents are Dutch subjects, the events took place on a Dutch ship not within the territorial waters of the United States, and the libellant was employed in The Netherlands. Against these considerations is only the fact that, for a period of approximately 18 months, this ship has come to this country regularly in its trade.

■ In view of the conclusion that the law of The Netherlands, rather than the Jones Act (46 U.S.C.A. § 688) or the general Maritime Law of the United States, governs the three causes of action stated in the libel, the exceptions and exceptive allegations to these causes of action, except for the claim for earned wages, will be sustained since this is an inconvenient forum for the trial of the issues raised by those causes of action. See Romero v. International Term. Co., 1959, 358 U.S. 354, 381–385, 79 S.Ct. 468, 3 L.Ed.2d 368; Medina v. Stockholms Rederi A/B Svea et al., No. 305 of 1956 in Admiralty (E.D.Pa., opinion of 12/31/56).

The doctors who treated libellant immediately after the accident are located in the Canal Zone. The record does not disclose where any witnesses to the accident are located or their nationality, but their depositions can be just as easily used in The Netherlands as in this court. The libellant was provided with air transportation to The Netherlands promptly upon his being certified by respondents' doctors as fit to travel.[7] Cf. Bickel, "For-

---

5. Paragraph 9 of Document No. 29 states that this responsibility has been delegated "to Vinke & Co. of Rotterdam, Holland, the shareholders of which are citizens and residents of Holland * * * (and that) while the vessel is in the ports of the United States, Vinke & Co. employ the services of Isbrandtsen Company, Inc. to perform the husbanding services for the vessel."

6. The "connecting factors" set forth in 345 U.S. at pages 583–591, 73 S.Ct. at pages 928–932 of the Lauritzen case, supra, as applied to this record, are as follows: (a) the place of the wrongful act was on the high seas on a Dutch boat and not in the territorial waters of this country; (b) the law of the flag is The Netherlands; (c) the libellant is a Greek citizen and is domiciled in that country; (d) the allegiance of the respondent shipowner is to The Netherlands; (e) the place of the contract was The Netherlands; (f) the foreign forum in The Netherlands was not inaccessible because the libellant was furnished air transportation to that country as soon as the respondents' doctors determined that he was able to travel (see affidavit and exhibits marked Document No. 25); and (g) the law of the forum is not significant under these circumstances (see pages 590–592 of 345 U.S., at pages 932–933 of 73 S.Ct. of the Lauritzen case, supra).

7. See affidavit and exhibits marked Document No. 25. The fact that he was found by another doctor to be unfit for travel a month later (see exhibits to Document No. 29) has very little, if any, probative value on the issues raised by the libel or amended libel, particularly since he was advised to limit weight bearing on his right leg, which advice he was apparently not following prior to his arrival in Philadelphia and disregarded on at least one occasion after April 21 (in Court Room 1 of U. S. Court House

um Non Conveniens in Admiralty," 35 Cornell L.Q. 12, 26–31. It is most significant that not only is the forum unfamiliar with the law of The Netherlands [8] but the parties differ in many respects as to what that law is as applied to this record.[9] The Supreme Court of the United States has made this statement on this subject:

"There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself."

See Gulf Oil Corp. v. Gilbert, 1947, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055.

In Kontos v. Liberian S.S. Sophie, et al., D.C., 184 F.Supp. 835, 837, relied on by libellant, the opinion emphasized that the Liberian Code adopted " 'the nonstatutory general Maritime Law' " of this country, which is familiar to this court, using this language at page 837 of 184 F.Supp.:

"There can be little doubt that a United States Court is as fully, or perhaps more, competent to apply the 'nonstatutory general Maritime Law of the United States' as is a court in Greece."

at the hearing of April 22—see pp. 26 ff. of Document No. 11). See letter of May 25, 1960, in Document No. 32, as well as Document No. 25.

8. So that the appellate courts will not be under any misconception (see the last sentence of footnote 6 at page 837 of 184 F.Supp. of Kontos case, infra), the author of this Memorandum Opinion does not understand the Dutch language and has no knowledge of the Dutch law, even though his ancestors came from that country.

9. Although respondents have filed an affidavit by an expert apparently well qualified to state the law of The Netherlands (Document No. 24), libellant's counteraffidavit (Document No. 29) states that libellant has legal rights under that law

■ Although Congress has expressly provided that this court has jurisdiction over the claim of foreign seamen for earned wages under circumstances which could be shown under the third cause of action (see 46 U.S.C.A. §§ 596 and 597), the libellant's letter of June 3, 1960, in Document No. 32, shows that his only claim was for $60 of such wages and the record indicates that all earned wages may have been paid by this date.[10] Respondents will be given an opportunity to show by stipulation, affidavit or similar document, the payment, as of June 6, 1960,[11] of wages covered by the abovementioned sections of Title 46 U.S.C.A. as a basis for submitting an order for dismissal of this third cause of action. Meanwhile, all proceedings in connection with the claim for such wages shall be stayed. Cf. Bickel, supra, pp. 23–26.

### Motion to Amend Libel.

■ After the filing of the exceptions and the exceptive allegations (Document No. 12), the libellant filed an amendment to the libel (Document No. 13), without court permission, on June 1 and a motion for leave to amend the libel nunc pro tunc as of June 1 (Document No. 14), in accordance with that amendment, on June 6, 1960. Insofar as this amendment contains a seventh cause of action, it is essentially a repetition and amplification of the part of the third cause of action

in addition to, and different from, those stated in Document No. 24.

10. The telegram of June 8, being Exhibit G to Document No. 26, authorizes respondents' counsel to pay libellant the balance of wages due him. This telegram was dated after the filing of the amended libel and of the motion to amend, so that it covers all wages claimed in this proceeding.

11. Since the seventh cause of action (Document No. 13), filed June 1, 1960, after the filing of the exceptions and exceptive allegations (Document No. 12), is actually a supplement to the third cause of action, this cause of action will be treated as demanding the wages covered by these sections (46 U.S.C.A. §§ 596 & 597) as of June 1, 1960.

claiming earned wages and will be allowed as such, with the right granted to respondents to file a responsive pleading (including exceptions and exceptive allegations) to this seventh cause of action. The motion will not be granted as to the remaining three causes of action for these reasons:

 A. The portion of these causes of action (fourth to sixth, inclusive) alleging assault and battery, false imprisonment, and damages for negligence in leaving the libellant in New York in a worse physical condition than he had previously been are legal causes of action and not properly within admiralty jurisdiction.[12] The denial of the motion as to these causes of action will be contingent upon respondents' filing the security entered in this action in an action at law covering these claims.

These three causes of action arise out of the action of respondents' representatives in escorting libellant, allegedly contrary to proper medical treatment, against his will and forcibly, from a Philadelphia hospital, where he had been pronounced fit for travel by the doctors (see Exhibits to Document No. 25), to an airport in New York, where he was placed aboard a plane en route to The Netherlands.[13] Libellant left the plane of his own free will and returned to Philadelphia. If these allegations are true, they must be proved by witnesses reasonably convenient to this forum and it is the duty of this Admiralty Court to facilitate libellant (a seaman and ward of admiralty) in securing an opportunity to establish here any causes of action he may have resulting from the above actions, at least, under the circumstances of this case, to the extent of seeing that there is a fund from which he may recover.

B. This court declines the portion of these allegations which are a supplement to the second cause of action for the same reasons as are stated above with respect to the first and second causes of action.[14]

Counsel may submit an appropriate decree.

12. For a discussion of joinder of legal and admiralty causes of action, see Kurland, "The Romero case and Some Problems of Federal Jurisdiction," 73 Harv. L.Rev. 817 (1960).

13. See Documents Nos. 25 and 29.

14. The briefs of counsel are being placed in an envelope in the Clerk's file, as well as the letters of June 29, June 3 and May 25 (the letters of July 6 and August 18 are attached to this Memorandum Opinion).