INTER ISLAND SHIPPING CORPORATION, Appellant, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, Respondent.

No. CI-63-7. Decided December 18, 1963.

*Hartzell, Fernández & Novas,* and *A. Santiago Villalonga* for appellant. *Donald R. Dexter, Carmen Ana Archeval,* and *Aura Nélida Pérez* for the Manager of the State Insurance Fund.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

The Inter Island Shipping Corporation, a corporation organized under the laws of Puerto Rico, with its main office in Puerto Rico, executed a contract of work in Puerto Rico with Roque Rosado Claudio, residing in Puerto Rico, by virtue of which Rosado Claudio would work as seaman on board the ship "TMT Lloyd" in trips from the port of San Juan, Puerto Rico, to St. Thomas and St. Croix, Virgin Islands, returning to San Juan port. Each of said trips had a duration of twenty-four to twenty-six hours, making an average of two trips a week.

Appellant obtained from the State Insurance Fund a labor accident policy on the basis of the total amount of its payroll

which included, not only the wages earned by its marine workers and employees in the work done inside the island of Puerto Rico, but also the work done outside the territorial limits of Puerto Rico during said trips.

On September 1, 1962, seaman Roque Rosado Claudio suffered an accident while the ship "TMT Lloyd" was anchored in waters of St. Thomas, Virgin Islands. On September 6, 1962, appellant filed a labor accident report with the State Insurance Fund of Puerto Rico. On October 31, 1962, the Manager of the State Insurance Fund decided that it lacked jurisdiction to entertain the case because the accident occurred outside the territorial limits of the Commonwealth of Puerto Rico. Appellant appealed from the decision to the Industrial Commission which rendered a decision dismissing the petition and affirming the decision of the State Insurance Fund. In the latter decision the point was also sustained that the employer was not entitled to appeal from the decision of the Manager, because said employer had not been declared uninsured by the Manager. Reconsideration was requested and denied.

On review in this Court, appellant assigns three errors: (1) that the labor accident involved in the present case was not covered by employer's policy; (2) that our Workmen's Accident Compensation Act is not effective extraterritorially to cover an accident which occurred to a laborer while he is in the scope of his employment outside the territorial limits of Puerto Rico for an employer insured with the State Insurance Fund; (3) that employer is not entitled to appeal to the Industrial Commission from a decision of the Manager of the State Insurance Fund in which said official refuses to include under the employer's policy a labor accident occurred to said employer's worker.

1–2. The power of the Legislature of Puerto Rico to establish a workmen's accident compensation system when the accident occurs in the maritime zone of Puerto Rico and

adjacent waters merits some history. After the cession of the province of Puerto Rico by the government of Spain to the government of the United States on April 11, 1899, the Congress of the United States adopted the Organic Act of 1900 approved on April 12, 1900 to govern in the island of Puerto Rico, § 9 of which, provided: "That the Commissioner of Navigation shall make such regulations, subject to the approval of the Secretary of the Treasury, as he may deem expedient for the nationalization of all vessels owned by the inhabitants of Puerto Rico on the eleventh day of April, eighteen hundred and ninety-nine, and which continued to be so owned up to the date of such nationalization, and for the admission of the same to all the benefits of the coasting trade of the United States; and the coasting trade between Puerto Rico and the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States."

To carry out the policy stated by the Congress of the United States in § 9, on May 12, 1906 the amendment to § 4348 of the Revised Statutes of the United States was adopted. It provides: "The seacoasts and navigable rivers of the United States and Puerto Rico shall be divided into five great districts: The first to include all the collection districts on the seacoasts and navigable rivers between the northern boundary of the State of Maine and the southern boundary of the State of Texas; the second to consist of the island of Puerto Rico; the third to include the collection districts on the seacoasts and navigable rivers between the southern boundary of the State of California and the northern boundary of the State of Washington; the fourth to consist of the Territory of Alaska; the fifth to consist of the Territory of Hawaii."

Section 13 of the Organic Act of 1900 also provided: "That all property which may have been acquired in Puerto

Rico by the United States under the cession of Spain in said treaty of peace in any public bridges, road houses, water powers, highways, unnavigable streams, and the beds thereof, subterranean waters, mines, or minerals under the surface of private lands, and all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor-works boards of Puerto Rico, and all the harbor shores, docks, slips, and reclaimed lands, but not including *harbor areas or navigable waters*, is hereby placed under the control of the Government established by this Act to be administered for the benefit of The People of Puerto Rico; and the Legislative Assembly hereby created shall have authority, subject to the limitations imposed upon all its acts to legislate with respect to all such matters as it may deem advisable."

When the Organic Act of 1917 was enacted, § 13 of the Organic Act of 1900 was substituted by §§ 7 and 8 of the new Act which provide: "That all property which may have been acquired in Puerto Rico by the United States under the cession of Spain in the treaty of peace entered into on the tenth day of December, eighteen hundred and ninety-eight, in any public bridges, road houses, water powers, highways, unnavigable streams and the beds thereof, subterranean waters, mines or minerals under the surface of private lands, all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor works boards of Puerto Rico, all the harbor shores, docks, slips, reclaimed lands, and all public lands and buildings not heretofore reserved by the United States for public purposes, is hereby placed under the control of the Government of Puerto Rico, to be administered for the benefit of The People of Puerto Rico; and the Legislature of Puerto Rico shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all such matters as it may deem advisable. *Provided,* That the President may from time to

time, in his discretion, convey to The People of Puerto Rico such lands, buildings, or interests in lands or other property now owned by the United States and within the territorial limits of Puerto Rico as in his opinion are no longer needed for purposes of the United States. And he may from time to time accept by legislative grant from Puerto Rico any lands, buildings, or other interests or property which may be needed for public purposes by the United States." (Section 7.)

■ "That the harbor areas and navigable streams and bodies of water and submerged land underlying the same in and around the Island of Puerto Rico and the adjacent islands and waters, now owned by the United States and not reserved by the United States for public purposes be, and the same are hereby, placed under the control of the Government of Puerto Rico, to be administered in the same manner and subject to the same limitations as the property enumerated in the preceding section: *Provided*, That all laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as the same may be locally inapplicable, shall apply to said Island and waters and to its adjacent islands and waters; *Provided, further*, that nothing in this Act contained shall be construed so as to affect or impair in any manner the terms or conditions of any authorizations, permits, or other powers heretofore lawfully granted or exercised in or in respect of said waters and submerged land in and surrounding said Island and its adjacent islands by the Secretary of War or other authorized officer or agent of the United States; *And provided, further*, That the Act of Congress approved June eleventh nineteen hundred and six, entitled 'An Act to empower the Secretary of War, under certain restrictions, to authorize the construction, extension, and maintenance of wharves, piers, and other structures on lands underlying

harbor areas in navigable streams and bodies of water in or surrounding Puerto Rico and the islands adjacent thereto,' and all other laws and parts of laws in conflict with this section be, and the same are hereby, repealed." (Section 8.) As may be seen, the power of the Legislative Assembly of Puerto Rico to establish a workmen's accident compensation system in the maritime zone, stems from § 8 of the Organic Act of 1917 and left in force by the Federal Relations Act of 1950. As the state of law which stems from the possible collision between the federal laws of admiralty and maritime compensation and our Workmen's Accident Compensation Act requires a review of the federal legislation and the case law applicable, we shall try a brief synthesis of said institution.

The power of the Congress of the United States to establish a compensation system for maritime damages flows from § 2 of Art. III of the Constitution of the United States of America, which provides: "The judicial power shall extend to all cases . . . of admiralty and maritime jurisdiction" in accordance with § 8 of Art. I of said Constitution, which provides: "The Congress shall have Power . . . To make all Laws which shall be necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

By virtue of said power, Congress enacted, on April 22, 1908, the Federal Employers' Liability Act which specifically referred to public carriers engaged in interstate commerce by railroad, the constitutionality of which was sustained. It was endeavored to apply said law to maritime workers and the Supreme Court did not permit it. On March 4, 1915, the Jones Act was enacted, granting to seamen a cause of action similar to that granted to railroad employees, and its constitutionality was sustained.

Notwithstanding that the provisions of the Constitution of the United States which we have quoted granted Congress

jurisdiction over all matters related to admiralty and maritime compensation, some states tried to adopt maritime labor compensation laws. An Act of 1914 of the State of New York produced the first important decision of the Supreme Court of the United States on the present case: *Southern Pacific Company* v. *Jensen*, 244 U.S. 205, 215, 61 L.Ed. 1086, 1098 (McReynolds) (1917). The case of *Jensen* established the rule that any state legislation on maritime compensation would contravene the essential purposes of the Constitution to maintain within the proper harmony and uniformity all maritime legislation, referring to international as well as to interstate relations. In view of said decision Congress decided to amend § 9 of the Judiciary Act of United States of 1789 by adding to the saving to suitors clause as to common-law remedies the remedies under the workmen's compensation laws of any state. Said amendment by addition was held unconstitutional in the case of *Knickerbocker Ice Co.* v. *Stewart*, 253 U.S. 149, 160–166, 64 L.Ed. 834, 839–841 (McReynolds) (1920). The case of *Knickerbocker* established the rule that although § 9 of the Judiciary Act had granted to the United States district courts cognizance of all civil causes of admiralty and maritime jurisdiction, Congress had exceeded its authority in sanctioning actions by the states under their workmen's compensation laws for employees engaged in maritime work because Congress could not transfer its legislative power to the states because by nature this is nondelegable.

Once more Congress intended, in 1922, to legalize the state maritime compensation by making an addition to the saving clause and also saving to claimants for compensation "for injuries to or death of persons other than the master or members of the crew of a vessel their rights and remedies under the workmen's compensation law of any State". Said amendment by addition was held unconstitutional in the case of *State of Washington* v. *W. C. Dawson and Company*, 264

U.S. 219, 225–227, 68 L.Ed. 646, 651–653 (McReynolds) (1924). In the case of *Dawson* the Supreme Court tried to untie the gordian knot, observing: "Without doubt Congress has power to alter, amend or revise the maritime law by statutes of general application embodying its will and judgment. This power, we think, would permit enactment of a general employers' liability law or general provisions for compensating injured employees; but it may not be delegated to the several States. The grant of admiralty and maritime jurisdiction looks to uniformity; otherwise wide discretion is left to Congress." From this judicial note stemmed the Longshoremen's and Harbor Workers' Compensation Act enacted by the Congress of the United States in 1927.

So that, in the mosaic of the federal laws applicable to maritime compensation which may have some relation to us we must emphasize the Jones Act of 1915 and the Longshoremen's and Harbor Workers' Compensation Act of 1927. A study of the different laws applicable to other risks or maritime or quasi-maritime injuries, passengers, visitors, etc., is made in Norris, Maritime Personal Injuries (Baker, Voorhis & Co. Inc., 1959 ed.). The moderate application we havé made up to now of the historic-evolutive method is for the purpose of placing in the right atmosphere the judicial rules applicable to Puerto Rico, which we shall specify below:

The first case which acknowledges the power of the Legislative Assembly of Puerto Rico pursuant to the Organic Act of 1917 to adopt a workmen's compensation system in our maritime zone is the case of *Lastra et al.* v. *New York & Porto Rico S.S. Co.*, 2 F.2d 812, 813–814 (Anderson) (1924). In said case the following pronouncements are made: (1) that Puerto Rico, not having been incorporated into the United States, the Constitution of the United States of America does not apply in Puerto Rico by its own virtue—*ex propio vigore* —(2) that Congress having failed to provide expressly that the admiralty provisions of the Constitution of the United

States shall extend to Puerto Rico, said provisions do not extend to Puerto Rico in the same manner as the uniform provisions in § 8 of Art. I of the Constitution of the United States relating to taxes, duties, imports and excises, citing the case of *Downes* v. *Bidwell*, 182 U.S. 244, 45 L.Ed. 1088 (Brown) (1901); (3) that §§ 7 and 8 of the Organic Act of 1917 grant the Puerto Rican Legislature a general local legislative power over the navigable waters of Puerto Rico; (4) that the fact that in Puerto Rico a District Court of the United States has been established to govern over cases of admiralty and maritime jurisdiction, does not import that the Congress of the United States has extended to Puerto Rico the substantive rights and remedies of the provisions on admiralty and maritime jurisdiction contained in the Constitution of the United States, and that two contemporary facts, such as the amendments by addition to the Judiciary Act of 1789, previously analyzed, show the intent of Congress in sustaining state legislation on workmen's compensation in the maritime zone.

In relation to the development of the doctrine of the effectiveness or noneffectiveness of the Constitution of the United States in Puerto Rico, see: § 2 of the Federal Relations Act of 1950 as to subdivision 1 of § 2 of Art. IV of the Constitution of the United States in relation to the rights, privileges and immunities of the citizens of the United States in Puerto Rico; *Mora* v. *Mejías*, 206 F.2d 377, 382, 386–388 (Magruder) (1953), referring to the clause of the due process of law: *Figueroa* v. *People of Puerto Rico*, 232 F.2d 615, 619 (Magruder) (1956), referring to the clause of the due process of law;—see, also, as to this last matter, *Balzac* v. *Porto Rico*, 258 U.S. 298, 312–313, 66 L.Ed. 627, 634 (Taft) (1922); *Detres* v. *Lions Building Corporation*, 234 F.2d 596, 600 (Swaim) (1956) referring to the diversity of citizenship of the citizens of Puerto Rico within the meaning of said diversity clause of the federal code of civil procedure.

Under the authority of the case of *Lastra* this Court decided the case of *United Porto Rican Sugar Co.* v. *District Court*, 44 P.R.R. 904, 906–907 (Wolf) (1933) by which compensation was granted to a seaman who died in his employer's tug not far from the port of Humacao. This Court refused to apply the Jones Act and applied our Workmen's Accident Compensation Act following the reasoning in the case of *Lastra*.

The second decision rendered by the Court of Appeals for the First Circuit, *Guerrido* v. *Alcoa Steamship Co.*, 234 F.2d 349, 352–355 (Maris) (1956), in the case of a longshoreman contracted by a stevedoring company, of which defendant Alcoa Steamship Company came to be a mere charterer, some of the pronouncements of the case of *Lastra* were substantially modified, but the power of the Legislative Assembly of Puerto Rico to adopt a system of workmen's compensation in our maritime zone was sustained. In the case of *Guerrido* it is stated that: (1) since Puerto Rico is neither a state of the union nor a territory which has been incorporated into the union preliminary to statehood it is true that all the provisions of the Federal Constitution are not necessarily in force, but under the same Constitution the Congress of the United States had power to extend to Puerto Rico, through the Organic Act of Puerto Rico of 1900 the maritime law in force in the United States; that Puerto Rico having been included in the Act of 1906 in the six great districts of domestic shipping laws the intention of Congress to preserve a uniform maritime law for all the states as well as the incorporated territories and the territories not destined for incorporation is evident; (2) that the Organic Act of 1900, in retaining under the jurisdiction of the United States the navigable waters of Puerto Rico, as a matter of fact, established that the general rules of maritime law as understood in the United States followed the flag to Puerto Rican waters; (3) that although §§ 7 and 8 of the Organic Act of 1917 had placed

the navigable waters of Puerto Rico under the jurisdiction of the Legislature of Puerto Rico, said power must be construed in accordance to the former legal status created by the Congress of the United States, it being proper to conclude: "that the rules of the admiralty and maritime law of the United States are presently in force in the navigable waters of the United States in and around the island of Puerto Rico to the extent that they are not locally inapplicable either because they were not designed to apply to Puerto Rican waters or because they have been rendered inapplicable to these waters by inconsistent Puerto Rican legislation"; (4) that the Workmen's Accident Compensation Act of the Commonwealth of Puerto Rico covers maritime workers except to the extent that it may have been superseded as to any class of maritime workers by compensation legislation passed by Congress and intended to be applied to all navigable waters of the United States.

■ In the third decision rendered by the United States Court of Appeals for the First Circuit, *Fonseca* v. *Prann*, 282 F.2d 153, 155–157 (Woodbury) (1960), in the case of some seamen-crew members of a ship property of the employer who contracted them, some of the pronouncements of the case of *Guerrido* were, if not modified, at least, duly explained. Let us see: (1) That "whatever the actual status of the Commonwealth of Puerto Rico may be in all its details, its present status is certainly not that of a State of the United States. Nor is it even that of a territory incorporated into the union preparatory to statehood. . . . As such the Government of Puerto Rico has such powers as Congress from time to time has seen fit to give it. And the broad power of Congress under Article IV, § 3, par. 2 [Constitution of the United States of America], to legislate for national territory is limited under the doctrine of the Insular Cases, so-called, only by fundamental constitutional principles" (as we have seen, by violations of the due process of law) ; that no basic

principle of the Constitution prevents Congress from giving Puerto Rico jurisdiction over its own waters; (2) that pursuant to the conclusion reached in the case of *Lastra,* followed in the case of *Guerrido,* §§ 7, 8 and 37 of the Organic Act of 1917, which are still in force and form a part of the Puerto Rican Federal Relations Act, give the Legislature of Puerto Rico general legislative power over the waters of Puerto Rico; (3) that although it is certainly true that neither the Jones Act nor the general maritime law concerning injuries related to unseaworthiness, Longshoremen's and Harbor Workers' Compensation Act of 1927, are inherently inapplicable in Puerto Rico, there is nothing in said laws specifically making its provisions applicable to Puerto Rico, for which reason the principle in the cases of *Lastra* and *Guerrido* that the Legislature of Puerto Rico is empowered to enact legislation inconsistent with the Jones Act and the general maritime law aforesaid should be followed; (4) that the Legislative Assembly of Puerto Rico has exercised said power in enacting the Workmen's Accident Compensation Act.

The doctrine laid down in the *Fonseca* case has the additional authority that the writ of certiorari requesting its review was denied by the Supreme Court: *Fermín Fonseca Flores* v. *Robert R. Prann,* 365 U.S. 860, 5 L.Ed.2d 822.

In the fourth decision rendered by the Court of Appeals for the First Circuit, *Waterman Steamship Corporation* v. *Rodríguez,* 290 F.2d 175, 179–180 (Maris) (1961), the case of a longshoreman contracted by a stevedoring company to unload cargo from an unseaworthy vessel which did not belong to his employer, the following ratifications and explanations in relation to the aforementioned cases were made: (1) that, as it was held in the *Guerrido* case, "the rules of the admiralty and maritime law of the United States are presently in force in the navigable waters of the United States in and around the island of Puerto Rico to the extent that they are not locally inapplicable either because they were not designed to

apply to Puerto Rican waters or because they have been rendered inapplicable to these waters by inconsistent Puerto Rican legislation"; (2) that as it was held in the *Fonseca* case, the Workmen's Accident Compensation Act of Puerto Rico has rendered the general maritime law of unseaworthiness inapplicable to Puerto Rican waters so far as concerns suits by injured seamen against their employers; (3) that as it was held in *Guerrido* case, the general maritime law of the United States of unseaworthiness has been applicable to Puerto Rican waters without the express provision of Congress on this matter, but subject to be superseded as a whole or in part by Puerto Rican legislation.

As may be seen, the decision of the Court of Appeals for the First Circuit, seems to be, that although the Organic Act of 1917 granted the government of Puerto Rico jurisdiction over its navigable waters, in the absence of Puerto Rican legislation to that effect, the rules of admiralty and the general maritime law of the United States are at present in force in Puerto Rico until superseded by any inconsistent Puerto Rican legislation, as our Workmen's Accident Compensation Act, because the "empty space" is covered by the previous provisions of the Organic Act of 1900.

Anyway, because of the deference due to the decisions of the Court of Appeals for the First Circuit, we shall try to decide whether this case should fall within the rules of admiralty. There being an obvious difference between maritime tort and a tort without implied fault as the one produced by a labor accident, it is unquestionable that the rule of admiralty which would bind us to contrast the law of the place where the offense occurred—*lex loci delicti commissi*—with the law in our forum, would not be applicable in this case. The facts show that the laborer who suffered the accident went ashore to buy some personal articles and when returning to the ship he fell on the gangplank. There is no issue whatsoever as to the place where the contract is signed

—*lex loci contractus*— because the liability of the policy tries to be effective in the place of issuance. As to the nationality of the owner of the ship, there is no doubt that the ship belongs to a corporation organized under the laws of Puerto Rico. As to the flag state, although the ship was of Panamanian registry, we would not feel bound to apply any provision of the Panamanian law on this particular. It seems Panama has a law which makes compulsory the submission to the Panamanian forum in all claims against the owner of the ship. As the Panamanian legislation favors the ship owner over the laborer many ship owners try to obtain their registration in Panama. The Supreme Court of the United States has refused to acknowledge said supremacy of the Panamanian law against the more favorable compensations of the North American states: *Lauritzen* v. *Larsen*, 345 U.S. 571, 590, 97 L.Ed. 1254, 1272 (Jackson) (1953), besides, this case does not deal with the claim of a seaman against the owner of the ship. Since it concerns an accident which occurred in the port of St. Thomas, we should not consider either the inaccessibility of the foreign forum which sometimes seeks its best solution in the courts of admiralty. As a question of reality, if we had to apply some of the patrimonial "maritime uses" of the island of Puerto Rico, recognized as they are by the admiralty law itself, the sea that separates our island from the Virgin Islands, has always been considered a "Puerto Rican lake"; in relation to the *lex forum* it is not a matter of applying the law of the Virgin Islands—an unincorporated territory—to a quasi-judicial organism of Puerto Rico, or vice versa, nor of deciding which of the two laws, in being more favorable, could better help to create an atmosphere of forbearance which the maritime countries try to foster to avoid retaliation against their own crews.

■ As to whether the Jones Act or the Longshoremen's and Harbor Workers' Compensation Act of 1927 of the Congress of the United States might be applicable, the ruling in

the case of *Fonseca* v. *Prann, supra*, which we shall apply as our local rule in this case, convinces us that said laws would not be applicable in view of our Workmen's Accident Compensation Act.

We have reached the conclusion that in a case like this, a simple case of coverage within a labor policy, we must adopt the practical criterion followed by the Supreme Court of the United States in the cases of *Cudahy Packing Co.* v. *Parramore*, 263 U.S. 418, 423–424, 68 L.Ed. 366, 369 (Sutherland) (1923) and *Bradford Electric Light Co.* v. *Clapper*, 286 U.S. 145, 157–158, 76 L.Ed. 1026, 1034 (Brandeis) (1932), and decide that this case deals with a simple labor-management relationship and said relationship creates a definite status which is not altered by the fact that the accident occurred outside the territorial limits, and which could have been recognized by the State where the labor relationship was created. The case in which a state compensates an accident occurred in another state or nation is not as unusual as it seems—*Biggs* v. *Theis*, 369 P.2d 32, 35 (Castles) (1942). In the case of *Saunders*, 136 Atl. 722, 723 (Wilson) (1927), a laborer employed in Maine and covered by the labor compensation law of said state, was compensated for an accident he suffered in Canada, where he went to work by orders of his employer. The *Saunders* case has been cited with approval in the case of *Lynch*, 183 N.Y. 834, 835 (Crosby) (1933); see, also, *Cullamore* v. *Groneweg & Schoentgen Co.*, 257 N.W. 561, 563 (Stevens) (1934); *Hilding* v. *Department of Labor and Industries*, 298 Pac. 321, 323 (Beeler) (1931); *In re Byrne*, 86 P.2d 1095, 1098 (Riner) (1939).

■ The Industrial Commission in declaring itself without jurisdiction in this case, applied the criterion that our Workmen's Accident Compensation Act does not cover an accident occurring outside our territorial limits. The fact that the employer in this case paid premiums also computed on the wages paid to the employer's maritime crew when it worked

outside of Puerto Rico is not argued. The power of the Legislature of Puerto Rico to provide medical assistance and hospitalization to our migrating laborers who are injured outside of Puerto Rico if they return to our country, Act No. 77 of June 23, 1958 is not argued. There is evidence that the benefits of our workmen's compensation has been extended to some of our officials called to work outside of Puerto Rico for accidents suffered outside our territory. The concept of "extraterritoriality" carries impliedly with it the invasion of the juridical sovereignty of another state, city, or political body. When said invasion is not produced, it can hardly be considered that the application of a law has been given extraterritorial effect.

We agree with the statement of the petitioner that the fact that the Manager of the State Insurance Fund declared himself without jurisdiction is equivalent to declaring the petitioner an uninsured employer.

The decision of the Industrial Commission will be reversed.