Felicia GRUNFEDER,
Plaintiff-Appellant,

v.

Margaret M. HECKLER,* Secretary of
Health and Human Services,
Defendant-Appellee.

No. 82–5751.

United States Court of Appeals,
Ninth Circuit.

Submitted March 10, 1983.

Decided June 14, 1983.

---

* Substitution of parties pursuant to Fed.R.Civ.P. 43(c)(1).

Josh A. Lazar, Terry B. Friedman, Elyse S. Kline, Bet Tzedek Legal Services, Los Angeles, Cal., for plaintiff-appellant.

James R. Arnold, Asst. U.S. Atty., Los Angeles, Cal., for defendant-appellee.

Before FLETCHER and NELSON, Circuit Judges, and THOMPSON,** Senior District Judge.

FLETCHER, Circuit Judge:

This case presents a question of first impression whether reparations, paid by the German Federal Republic for injury to body and health pursuant to the German Restitution Act of 1956 (GRA), constitute countable "income" for purposes of determining eligibility for supplemental security income (SSI) benefits under the Social Security Act (SSA), 42 U.S.C. §§ 1381–85 (1976 & Supp. V 1981). The Secretary concluded that the reparations in this case, based on a loss of earning capacity caused by Nazi persecution, are to be counted as "income" in determining the recipient's eligibility for SSI benefits. We have jurisdiction under 28 U.S.C. § 1291 (1976) and affirm.

## FACTS

During World War II, Felicia Grunfeder, a Polish Jew born in 1938, was incarcerated in the Warsaw ghetto for several years. In 1943, her mother delivered her to a non-

Jewish couple, who held out the child as their own. In 1945, Grunfeder and her mother were reunited, and both relocated in the United States in 1949.

Grunfeder suffered psychological effects from her incarceration in the Warsaw ghetto and from the separation from her mother. In the mid 1960's, she petitioned the German government for reparations under the GRA for injury to her body and health—including schizophrenia, inability to concentrate, nervousness, depression, and neurosis. Grunfeder received from the German government three awards in compensation for her injuries.

The first two awards, made on June 12, 1968, compensating her for an expected lifetime lowering by "25 percent" of her "earnings due to persecution," were (1) a lump sum award covering the years 1945 through 1953 and (2) a monthly pension from 1953 onward. These two awards were intended to settle all of her demands under the GRA for "[r]estitution of damages to Body of [sic] Health," except for "possible demands for a Healing Process (medical treatments)," which were "reserved" for later determination.

The third award, made on July 8, 1968, was also a lump sum payment and was intended to settle all demands under the GRA "for indemnification for damages to body or health with reference to a healing-process." This one-time award was "granted . . . for the past and future, for Damage to Body or Health, in indemnification of all medical expenses, over and above the demands already granted" in the partial settlement of June 12, 1968.

In 1974, Grunfeder applied for and began receiving SSI payments. In February of 1980, upon learning for the first time of Grunfeder's German pension, the Social Security Administration terminated her SSI benefits on the ground that pension receipts constituted "unearned income" under the SSA, making her ineligible for SSI benefits.

---

** The Honorable Bruce R. Thompson, Senior District Judge for the District of Nevada, sitting by designation.

Following a denial of her motion for reconsideration, Grunfeder obtained a hearing before an administrative law judge (ALJ), who denied her appeal on June 10, 1980. On October 23, 1980, the Appeals Council denied Grunfeder's request for review of the ALJ's decision. On June 15, 1982, the district court, exercising jurisdiction under 42 U.S.C. § 405(g) (1976 & Supp. IV 1980), dismissed Grunfeder's complaint seeking review of the ALJ's decision. She now appeals, contending (1) that the reparations are not "income" under the SSA; (2) that even if they do constitute "income," the payments must nonetheless not be counted as "income" on grounds of (a) equal protection or (b) international comity.

## DISCUSSION

The SSI program is a federal program designed to supplement the income of aged, blind, or disabled persons who are "needy." See H.R.Rep. No. 231, 92d Cong., 1st Sess. 2, *reprinted in* 1972 U.S.Code & Cong.Ad. News 4989, 4990. An individual is eligible for SSI benefits if his annual "income" is below $1,752 and his "resources" are less than $1,500. 42 U.S.C. § 1382(a)(1) (1976). The Act defines "income" to include both earned and unearned income. *Id.* § 1382a(a). Unearned income means "all other income," including:

(A) support and maintenance furnished in cash or kind . . .;

(B) any payments received as an annuity, pension, retirement, or disability benefit, including veterans' compensation and pensions, workmen's compensation payments, old-age, survivors, and disability insurance benefits, railroad retirement annuities and pensions, and unemployment insurance benefits;

(C) prizes and awards;

(D) the proceeds of any life insurance policy to the extent that they exceed the amount expended by the beneficiary for purposes of the insured individual's last

illness and burial or $1,500, whichever is less;

(E) gifts (cash or otherwise), support and alimony payments, and inheritances; and

(F) rents, dividends, interest, and royalties.

*Id.* § 1382a(a)(2). The statute also sets forth certain exclusions from income including any need-based assistance furnished by any state or political subdivision of a state and federal disaster relief. *Id.* § 1382a(b).

## I. Treatment of Reparations as "Income."

Grunfeder contends that her pension payments are not "income" either (a) because reparations are not the sort of "income" to which section 1382a(a) refers, or (b) because, in any event, she uses some of the monies received for medical services.

### A. Source of Reparations in Outrageous Acts.

Grunfeder argues first that reparations do not constitute "income" under section 1382a(a), since Congress did not intend compensation for outrageous injury to body and health to be counted in determining SSI eligibility. Relying on the regulations promulgated under the SSA, the Secretary argues that " 'income' . . . means the receipt by an individual of *any* property . . . which he can apply . . . to meeting his basic needs for food, clothing, and shelter." 20 C.F.R. § 416.1102(a) (1979) (emphasis added). She asserts that, because "need" is the key criterion underlying the SSI program, the term "income" must be read broadly to encompass all revenues actually received by an individual which could be used for "food, clothing, and shelter" and not in a more narrow sense of earnings or return on investment.[1]

Neither the Act, its legislative history, nor the regulations promulgated under the SSA explicitly state that reparations payments or, more generally, tort recoveries,

---

1. The current regulations, that became effective on October 8, 1980, after the termination of Grunfeder's SSI benefits in February 1980 but before the final decision of the Secretary on October 23, 1980, retain a need-based definition

of "income." *See* 20 C.F.R. § 416.1102 (1982) ("[i]ncome is anything [one] receive[s] in cash or in kind that [one] can use to meet [one's] needs for food, clothing, or shelter").

are to be counted as "income" in determining SSI eligibility. Nevertheless, we conclude that the Secretary has the sounder position.

First, the SSA itself states that "income" includes "workmen's compensation" and "veterans' compensation" payments. 42 U.S.C. § 1382a(a)(2)(B) (1976). These awards are in large part analogous to reparations in that these payments are intended to redress physical and emotional damages arising from past injuries. Even though a person receiving $100 a month in "workmen's compensation" might reasonably be expected to be more needy than one receiving the same amount in "prizes" or "inheritances," the statutory language leaves little room to doubt that Congress nonetheless intended both individuals to be evaluated for SSI eligibility in precisely the same manner.

The broad sweep of the language of the SSA, that includes in "income" several types of revenue which are not ordinarily considered "income" in the sense of earnings or return on investment, such as annuity payments (regardless of investment in the contract), gifts, and workmen's compensation benefits, evidences a Congressional intent to treat all receipts, including reparations, as income. Likewise, several explicit statements in the legislative history that stress a desire to help only "needy" individuals, see H.R.Rep. No. 231, 92d Cong., 1st Sess. 2, 147, 157, reprinted in 1972 U.S.Code Cong. & Ad.News 4989, 4990, 5133, 5143, and a specific assertion that unearned income includes "benefits from all other public and private pension, disability, or unemployment programs", id. at 152, reprinted in 1972 U.S.Code Cong. & Ad.News at 5138 (emphasis added), also support a conclusion that Congress meant all cash revenues received by an individual to be counted as "income."

The regulations in effect at the time of the termination of Grunfeder's SSI benefits as well as the current regulations support the treatment of reparations as "income." While both the old and new versions of the regulations set forth certain receipts which are excluded from "income," see 20 C.F.R. §§ 416.1105–416.1112 (1979); 20 C.F.R. § 416.1103 (1982) (effective Oct. 8, 1980), the two exclusions that are arguably applicable to reparations cannot be so read. As we explain more fully below in Part I(B), the exclusion for "medical services" does not apply to Grunfeder's reparation payments. See 20 C.F.R. § 416.1109(a) (1979); 20 C.F.R. § 416.1103(a) (1982). Nor do the exclusions provided by regulation for certain social services apply. The "social services" exclusion in the prior regulations applies only to receipts in the form of "advice, consultation, training . . ., or other services of a strictly social nature," not to unrestricted pension payments. See 20 C.F.R. § 416.1109(b) (1979). Similarly, the current exclusion applies to cash payments received from "a nongovernmental social services program" only if the payments are explicitly restricted to payment for program-approved services. See 20 C.F.R. § 416.-1103(b)(3) (1982).

That two sorts of payments similar to reparations (federal disaster relief and tribal settlement payments) are not "counted" as "unearned income" for purposes of determining SSI eligibility lends no comfort to Grunfeder's position. Both exclusions are based on federal statutory provisions which direct that certain federal benefits are not to be "counted" as "unearned income" in determining eligibility for SSI benefits. See, e.g., 42 U.S.C. § 1382a(b)(11) (1976) (assistance received under the Disaster Relief Act of 1974); 25 U.S.C. § 1264 (1976) (per capita judgment funds distributed to Blackfeet and Gros Ventre tribal members). The prior and current regulations excluding these payments do so on the authority of those statutes. See, e.g., 20 C.F.R. § 416.-1156(a) (1979) (federal disaster relief); 20 C.F.R. § 416.1124(c)(5) (1982) (same); 20 C.F.R. § 416.1146(b) (1979) (Blackfeet and Gros Ventre tribal payments); 20 C.F.R. §§ 416.1124(b) & 416 subpt. K app. (IV)(b)(1) (1982) (same). Given the similarity of reparations payments to disaster relief and tribal settlement payments, the fact that they are considered "unearned income" under the statute is instructive. It took

special statutory and regulatory exclusions to delete them from "unearned income." Unfortunately, no such exclusions exist for reparations.

 The test of whether a receipt is "income" under section 1382a(a) is not an individualized one that relies on the particular recipient's reason for receiving the payment or the manner in which she uses the payment, but rather is an objective test to determine whether an individual in the shoes of the recipient *could* use the payments for food, clothing, or shelter. *See* 20 C.F.R. § 416.1102(a) (1979); 20 C.F.R. § 416.1102 (1982). Since Grunfeder's reparations are fully available to her for use for food, shelter, or clothing, we conclude that, regardless of how Grunfeder herself spends her pension payments, those monies are "income" under section 1382a(a).

B. *Use of Payments for Medical Services.*

 Both the prior and current versions of the SSI regulations provide that certain medical services receipts are not to be treated as "income." Grunfeder contends that since she uses part of her pension to pay psychiatric fees, the pension payments are not income. We disagree.

2. The GRA establishes, *inter alia,* a comprehensive program designed to compensate individuals for damage to health and limb, wherever "damage to the persecutee was not inconsiderable, which means that his physical and/or mental capacities were or will be decreased permanently." *See* Institute of Jewish Affairs, *The (West) German Federal Legislation in the Field of Compensation to Victims of Nazi Persecution* 12 (2d ed. 1956). Under the GRA, however, indemnification consists of not merely "medical assistance, or its equivalent in money (including past expenses)," and " 'house' payment (during medical treatment)," but also "vocational readjustment assistance, and, if the working capacity of the persecutee was reduced by at least 25 per cent, annuities." *Id.* at 13.

3. The current regulations provide that "medical care and services" do not constitute "income" only if they are:
(1) Given to you free of charge or paid for directly to the provider by someone else;

The regulation pertaining to the treatment of medical services as income that was in effect at the time Grunfeder's benefits were terminated is on its face inapplicable to Grunfeder's reparations. *See* 20 C.F.R. § 416.1109(a) (1979). Even if Grunfeder's pension is in fact *spent* on medical services, it is not a "third-party payment *for* medical care or medical services furnished to a beneficiary" required under the old regulation. *Id.* (emphasis added). First, the pension is a payment, unrestricted in use, which could be applied by Grunfeder to meet her basic nonmedical needs. Furthermore, even if unrestricted payments are excluded from "income" under 20 C.F.R. § 416.1109(a) if explicitly earmarked for medical use, her payments were not so earmarked. The GRA provides that annuities are for a diminution of "working capacity."[2] Further, the language of the documents establishing Grunfeder's awards does not designate her pension for use for medical care and services. By contrast to her one-time lump sum payment, awarded in the final settlement of July 8, 1968, which is designated for medical assistance, the reparations she continues to receive pursuant to the partial settlement of June 12, 1968, are designated for loss in "working capacity." Nor do the current regulations put into effect subsequent to her termination support Grunfeder's position.[3]

(2) Room and board you receive during a medical confinement;
(3) Assistance provided in cash or in kind (including food, clothing, or shelter) under a Federal, State, or local government program, whose purpose is to provide medical care or services (including vocational rehabilitation);
(4) In-kind assistance (except food, clothing, or shelter) provided under a nongovernmental program whose purpose is to provide medical care or medical services;
(5) Cash provided by any nongovernmental medical care or medical services program or under a health insurance policy (except cash to cover food, clothing, or shelter) if the cash is either:
(i) Repayment for program-approved services you have already paid for; or
(ii) A payment restricted to the future purchase of a program-approved service. . . .
(6) Direct payment of your medical insurance premiums by anyone on your behalf.
20 C.F.R. § 416.1103(a) (1982).

Because neither the statute nor the regulations exempt payments from the category of "income" simply because the recipient spends all or part of them on medical services, all of Grunfeder's monthly pension payments are section 1382a(a) "income."[4]

## II. Non-Counting of Reparations as "Income."

Grunfeder argues that even if reparations constitute section 1382a(a) "income," the payments should not be counted as income in her case. Grunfeder points to no statutory or regulatory authority compelling the Secretary to ignore her pension payments. Rather, she contends that the Secretary must do so to prevent the existing "non-counting" provisions of the regulations from violating equal protection. She further asserts that the Secretary is compelled to ignore her pension for reasons of international comity.

### A. Equal Protection.

Grunfeder contends that since revenues distributed to Alaska native Americans under the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–28 (1976 & Supp. IV 1980), are not counted as "income" pursuant to the regulations, see 20 C.F.R. §§ 416.-1145(a), 416.1146(*l*) (1979); 20 C.F.R. §§ 416.1124(b) & 416 subpt. K app. IV(a) (1982), her reparations must similarly not be counted to prevent a violation of equal protection. She is in error.

■ With regard to public assistance benefits, equal protection requires only that those benefits be allocated on a reasonable basis, bearing a fair and substantial relation to the object of the legislation. *E.g., Califano v. Aznavorian,* 439 U.S. 170, 174–75, 99 S.Ct. 471, 473–74, 58 L.Ed.2d 435 (1978).

Moreover, the courts have long recognized the validity of differing Congressional treatment given members of Indian tribes and that accorded others, because of Congress' unique obligation toward the Indian entities and their members. *Morton v. Mancari,* 417 U.S. 535, 554–55, 94 S.Ct. 2474, 2484–85, 41 L.Ed.2d 290 (1974) (collecting cases).

■ Under these principles, an allocation of SSI benefits to individual Alaska Indian tribal members and not to Grunfeder, even though both might receive equal annual amounts of "income" (one through Settlement Act payments, the other through German reparations) presents no equal protection violation. Giving greater benefits, in effect, to an Alaska native with the same "income" as Grunfeder rationally relates to Congress' purpose in part to provide reparation for the extinguishing of native title to lands owned by that tribal member or his ancestors, for which the United States was itself responsible.

### B. International Comity.

Grunfeder also contends that the doctrine of international comity "vests the court with the duty of interpreting domestic law so that a conflict does not occur" between the domestic statute and foreign law and asserts that the "application of comity principles lies within the province of the Court and not Congress." While the proposition is sound, it has no application to this case.

■ The doctrine of comity, when raised in cases involving the construction of a United States statute, is only a principle of statutory construction. It requires that a statute be construed to minimize interference with the fruition of policies of other nations, in the absence of a showing of

---

4. Section 1382a(b)(6), which excludes need-based governmental payments from the category of § 1382a(a) "income," does not apply to the reparations here. First, that provision literally applies only to assistance "furnished by any State or political subdivision of a State" and not to foreign countries. *See* 42 U.S.C. § 1382a(b)(6). Second, while Grunfeder's pension is based on a predicted loss of earning capacity, it is not sufficiently linked to her *actual* income to constitute assistance "based on need" as required by the statute. *See* 20 C.F.R. § 416.1151(a) (1979) ("assistance" must be "furnished . . . under a program which uses income, or income and resources, as criteria for determining eligibility"); 20 C.F.R. § 416.-1124(c)(2) (1982) ("assistance based on need" defined as "provided under a program which uses the amount of your income as one factor to determine your eligibility").

Congressional intent to interfere. *See, e.g., Lauritzen v. Larsen,* 345 U.S. 571, 577–78, 592, 73 S.Ct. 921, 925–26, 933, 97 L.Ed. 1254 (1953) ("[a]ny seaman" in Jones Act held not to include Danish sailor with regard to events on Danish ship outside U.S. waters); *United States v. Palmer,* 3 Wheat. 610, 631, 4 L.Ed. 471 (1818) (Marshall, J.) ("any person or persons" in statute punishing certain acts committed on high seas held not to include person on foreign ship, since broad words must be limited "to those objects to which the legislature intended to apply them"). While the rule stems from a rule of international law by which one nation respects the rights of all other sovereign powers outside its own territory, it "is not, as sometimes is implied, any impairment of our own sovereignty or limitation of the power of Congress." *Lauritzen,* 345 U.S. at 578, 73 S.Ct. at 926. Rather, the rule is merely a means of

> dealing with a problem of statutory construction rather commonplace in a federal system by which courts often have to decide whether "any" or "every" reaches to the limits of the enacting authority's usual scope or is to be applied to foreign events or transactions.

*Id.* at 578–79, 73 S.Ct. at 926 (footnote omitted). The doctrine of comity represents not a limitation on Congressional power but rather a tool for discerning Congressional intent.

■ Given that the doctrine of international comity is essentially a rule of statutory construction, Grunfeder's argument amounts to an assertion that Congress did *not* intend German—as opposed to domestic—reparations to be counted as section 1382a(a) income because counting such benefits might make the recipient of reparations ineligible for SSI benefits and thus might frustrate the policies of the GRA. Whether to construe section 1382a(a) to exclude German reparations as "income" for reasons of international comity thus depends on (1) whether construing section 1382a(a) to extend to German reparations would in fact frustrate the effectuation of the policies underlying the GRA, and (2) even if such a construction would frustrate

German law, whether Congress failed to express an intent to count income derived from foreign sources. Neither of these elements necessary for the invocation of international comity to narrow the application of section 1382a(a) obtains here.

First, counting reparations in the determination of SSI eligibility does not frustrate or interfere with the overriding objective of the German Restitution Act: to compensate persons injured by the outrages of the Nazi regime. Regardless of whether reparations are counted as "income" under American law, Grunfeder will receive recompense in the amount deemed appropriate under German law. The counting of those benefits in determining SSI eligibility in no way impinges on that goal. Grunfeder, like every other recipient of GRA reparations, receives precisely that amount which the German Federal Republic has deemed appropriate.

Nor can the linking of Grunfeder's eligibility to the counting of reparations be viewed as a concealed tax, invidiously depriving her of her reparations. We do not have here a test of SSI eligibility that singles out German reparations for special treatment. All persons who receive over $1,752 in annual income—not just those who receive over that amount through reparations—are denied SSI benefits. Counting reparations as income no more "frustrates" the policies of the GRA than would counting awards monies frustrate the goals of the Nobel Prize Committee.

Even were we to assume that counting reparations in determining SSI benefits did frustrate the effectuation of the GRA, comity considerations are inapplicable here. Grunfeder is an American citizen seeking American benefits. Given that Congress intended tort recoveries and reparations to be treated as income, since the receipt of such revenues reduces one's "need," *see supra* Part I(A), Congress surely meant those payments to be counted as income regardless of whether their source be domestic or foreign. The receipt of payments and their availability for use for food, clothing, and

shelter inside the United States—and *not* their source—is the crucial factor in determining need. Even if the counting of reparations as income does interfere with the policies of the GRA, comity principles provide no ground for not counting the reparations as income. Congress' expressed intent to assist only needy persons excludes a reading of the statute that would take into account only domestic, but not foreign, receipts.

## CONCLUSION

The decision of the district court affirming the decision of the ALJ that Grunfeder's pension is income under 42 U.S.C. § 1382a(a) is affirmed.