In re MILLENIUM SEACARRIERS, INC., et al., Debtors.

Assuranceforeningen Skuld (Gjensidig)-Den Danske Afdeling; Liberian International Ship & Corporate Registry, LLC; Maritime Transport Workers' Union of Russia; Orient Shipping Rotterdam, B.V.; and Universal Oil, Ltd., Appellants,

v.

Allfirst Bank (f/k/a First National Bank of Maryland) and Wayland Investment Funds, L.L.C., Appellees.

Nos. 02–10180(CB), 02 CV 7106(RPP), 02 CV 7107 (LBS), 02 CV 7108 (DC), 02 CV 7534 (KMW), 02 CV 7537 (HB).

United States District Court,
S.D. New York.

April 25, 2003.

Lambos & Junge, by Peter A. Junge, Esq., Armand P. Mele, Esq., New York City, for Appellants.

Holland and Knight LLP, by James H. Hohenstein, Esq., James Power, Esq., New York City, for Appellees.

**OPINION AND ORDER**

ROBERT P. PATTERSON, Jr., District Judge.

Appellant–Adversary Plaintiff, Assuranceforeningen Skuld (Gjensidig)-Den Danske Afdeling ("Skuld"), appeals pursuant to 28 U.S.C. § 158 from an order

entered on August 1, 2002, by Honorable Cornelius Blackshear, United States Bankruptcy Judge, which denied Skuld's motion for summary judgment and granted summary judgment against Skuld to Appellees–Adversary Defendants, Allfirst Bank ("Allfirst") and Wayland Investment Funds, L.L.C. ("Wayland"), collectively "Foreign Mortgagees." [1]

## Background

This matter arises from the Chapter 11 filing on January 15, 2002, of Millenium Seacarriers, Inc. ("Millenium") and its wholly-owned subsidiary companies (the "Subsidiaries"), the owners of nineteen ocean-going merchant vessels. Each of the vessels was owned by one of the subsidiaries and was subject to a foreign preferred ship mortgage in favor of the Foreign Mortgagees from whom Millenium had received financing. Skuld is a Norwegian protection and indemnity insurance club, which provides its vessel-owning members with protection and indemnity ("P & I") insurance against third party liabilities arising in connection with the operation of vessels entered with the insurance club.

On March 15, 2002, Skuld filed a Notice of Preferred Maritime Liens for Necessaries pursuant to the Federal Maritime Lien Act, 46 U.S.C. § 31342 for unpaid insurance premiums and calls for the year, February 20, 2001 to February 20, 2002, against ten of Millenium's nineteen vessels, totaling $984,759.53. (Declaration of Peter A. Junge dated May 21, 2002 ("Junge Decl.") Exh. F, Declaration of Jan Katkjaer dated March 14, 2002 ("Katkjaer Decl.") at ¶ 5.) Millenium Management, Inc. ("Management") was the sole owner of Millenium. Management, Millenium and the Subsidiaries were all holding companies without functioning offices or employees. The operations of these entities were conducted through the sub-managing companies, Millenium Maritime Services, Inc. ("Millenium New York") [2] and Millenium Maritime Services, Ltd. ("Millenium Piraeus").[3] (Junge Decl., Exh. C, Deposition of Vassilios Livanos ("Livanos Dep.") at 6–7, 13; Exh. D, Deposition of Sunil Damodar ("Damodar Dep.") at 15–16.)

Millenium's sole source of income was hire money generated from time chartering and spot chartering the fleet of nineteen vessels, all of which called at United States ports. (Junge Decl., Exh. D at 34, Exh. E at 28.) The chartering department for the entire Millenium fleet, which was responsible for finding and negotiating all vessel charters, was located only at Millenium New York. (Junge Decl., Exh. C at 20–21.) All wire moneys generated by the Millenium vessels were paid to Millenium's bank accounts at Bank of New York in New York City. (Junge Decl., Exh. D at

---

1. The Mortgagees held foreign registered mortgages on each of the vessels owned by Millenium Sea Carriers, Inc. On March 27, 2002, those vessels were sold by order of the Bankruptcy Court to Wayland, pursuant to Section 363 of the Bankruptcy Code, subject to any liens having a priority over the foreign mortgage liens.

2. Millenium New York operated solely out of its Manhattan office at 645 Madison Avenue. (Junge Decl., Exh. C at 9, 27.) Vassilios Livanos, Chairman and President of Management, Millenium and Millenium New York, and Director of Millenium Piraeus operated and maintained his only office at Millenium New York on Madison Avenue. (Junge Decl., Exh. C at 11–19.)

3. Millenium Piraeus was located in Greece and was responsible for providing technical or operational services to the Millenium fleet. It did not maintain either a chartering department or an insurance and claims department for at least a year prior to the filing of Millenium's bankruptcy petition and had nothing to do with the placement of insurance or payment of premiums with Skuld. (Junge Decl., Exh. C at 19–21.)

20–36.) Management and Millenium New York also maintained their bank accounts at the Bank of New York in Manhattan. (Junge Decl., Exh. D at 33.)

Sunil Damodar, the Treasurer of Management, Millenium, Millenium New York, and all the Subsidiaries, was responsible for transferring "99 percent" of Millenium's funds and for paying all the Subsidiaries' expenses, including insurance premiums. (Junge Decl., Exh. D at 19.) His office was at Millenium New York in Manhattan. (Junge Decl., Exh. D at 5, 13, 18–20, 37.)

Insurance and risk management functions for the entire Millenium fleet were conducted exclusively by Abraham Kravitz at Millenium New York in Manhattan. (Junge Decl., Exh. E at 5.) Mr. Kravitz was employed by Millenium New York and was responsible for negotiating and placing Protection and Indemnity ("P & I") insurance coverage and handling claims for all nineteen Millenium vessels. (Junge Decl., Exh. E at 8–10.) Mr. Kravitz's duties were critical to the operation of the Millenium fleet since he was responsible for obtaining $1 billion (Junge Decl., Exh. A at 94; Katsjaer Dep. at "00511") in pollution insurance for each vessel through P & I underwriters, including Skuld. (Junge Decl., Exh. E at 13–18, 28–29.) Millenium was required to have P & I pollution coverage in order to obtain a Certificate of Financial Responsibility ("COFR") for each Millenium vessel from the U.S. Coast Guard. Millenium vessels could only trade in the United States with valid COFR documentation. (Junge Decl., Exh. E at 28–29.)

Skuld issued COFR letters to Millenium for $500 million of basic coverage and sent them to Kravitz's office in New York. Mr. Kravitz then provided the COFR letters to the guarantor who provided the additional $500 million in coverage and guaranteed the COFR. (Junge Decl., Exh. E at 28–31, 81.) Through Mr. Kravitz, Millenium New York insured ten of Millenium's nineteen vessels with Skuld (Junge Decl., Exh. E at 15–16), which allowed all ten vessels to trade in American ports. (Junge Decl., Exh. E at 28.)

A premium for each vessel entered with Skuld was separately negotiated and fixed, depending on the vessel's age and gross tonnage. A separate Certificate of Entry, evidencing P & I coverage, was issued by Skuld for each vessel. (Junge Decl., Exh. E at 17–19.) All of Mr. Kravitz's negotiations for P & I coverage with Skuld were conducted from Millenium New York's office. All of Skuld's Certificates of Entry and COFR letters, which were the initial layer of insurance required for issuance of the COFRs, were sent by Skuld to Kravitz's office in Manhattan. (Junge Decl., Exh. E at 21, 30–31.)[4] The insurance was issued from Skuld's office in Copenhagen, Denmark, as shown by the Certificates of Entry. (Affidavit of James H. Hohenstein, dated May 30, 2002 ("Hohenstein Aff. I"), Exh. D.) The vessels insured were foreign flagged, owned by Greek and Cayman Island corporations, and traded worldwide. (Junge Decl., Exh. C at 32.) Millenium's negotiations concerning the insurance contract were conducted on the telephone with Mr. Katkjaer in Copenhagen. (Junge Decl., Exh. D at 21.) Confirmation of P & I coverage for 2001–2002 was made with Millenium by Mr. Katkjaer from Copenhagen. (Affidavit of James H. Hohenstein dated June 7, 2002 ("Hohenstein Aff. II"), Exh. A; Junge Decl., Exh. E at 62.)

4. Mr. Kravitz made three visits to Skuld in Copenhagen, Denmark, between 1999 and 2001, however the visits were not for the purpose of negotiating or placing insurance. (Junge Decl., Exh. E at 72–75.)

### The Decision of the Bankruptcy Court

The decision of the Bankruptcy Court found that there were no material facts in dispute, denied Skuld's motion for summary judgment claiming a priority of its insurance premium liens over the lien of the Foreign Mortgagees and granted the cross motion of the Foreign Mortgagees. The decision noted that Skuld's Statutes and Rules, drafted by Skuld, provide that any disputes between the parties shall be determined by arbitration in Oslo pursuant to Norwegian law, and that the first line of Skuld's Certificates of Entry reads: "This insurance is subject to Norwegian Law and Arbitration in accordance with Skuld's Statutes and Rules."

The Bankruptcy Court determined that since the transactions in question were international in character, Skuld's forum selection and choice of law clause are presumed valid and should control, citing *The Bremen, et al. v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Roby, et al. v. Corporation of Lloyd's, et al.*, 996 F.2d 1353, 1362 (2d Cir.1993), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Sembawang Shipyard Ltd. v. M/V Charger*, 955 F.2d 983 (5th Cir.1992). It also noted that such clauses applied not only to *in personam* actions but to *in rem* actions brought to determine whether plaintiff holds a maritime lien, *citing Sembawang*, 955 F.2d at 986 and *The Bremen*, 407 U.S. at 20, 92 S.Ct. 1907.

The Court relied on the Declaration and Supplemental Declaration of Lars Musaeus, a Norwegian attorney, submitted by the Foreign Mortgagees, opining that, under Norwegian law, there was no maritime lien for supplies for necessaries.

In response to Skuld's argument that the Court should follow *West One Bank, Washington v. Continuity, et al.*, 1994 AMC 2059, 1994 WL 584723 (W.D.Wa. 1994), and apply the "greatest interest" rule in deciding whether the choice of law of the contract or the law of the United States governed, Judge Blackshear distinguished *West One Bank* on the grounds that the vessel subject to the insurance contract in *West One Bank* operated solely in American waters and the insurance contract was executed in New York and that, accordingly, in *West One Bank* the grouping of contacts test required the application of the laws of the United States. Judge Blackshear then applied the factors cited in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) used in maritime tort cases and general maritime law and cited *Advani Enterprises, Inc. v. Underwriters at Lloyds, et. al*, 140 F.3d 157 at 162 (2d Cir.1998), to find that, under the grouping of contacts test, Norwegian law would apply in this case.

### The Argument on Appeal

In its appeal Skuld argues that unpaid P & I insurance premiums are necessaries under the Federal Maritime Lien Act. It relies principally on *Equilease v. M/V Sampson, et al.*, 793 F.2d 598 (5th Cir. 1986), a decision which held that insurance premiums are necessaries and claims for unpaid premiums constitute a maritime lien on a vessel under the Federal Maritime Lien Act. *Equilease*, however, did not involve an international transaction contract containing a choice of law provision.

Skuld also relies on several District Court cases: *North of England Protecting and Indemnity Association, Ltd. v. M/V Nara*, 2000 AMC 681, 1999 WL 33116416 (E.D.La.1999); *Caterpillar Financial Services Inc. v. Aleutian Chalice v. Assuranceforeningen Skuld (GJENSIDIG)*, 1994 AMC 1767, 1994 WL 468187 (W.D.Wash. 1994); *The Flagship Group, Ltd. v. Peninsula Cruise, Inc.*, 771 F.Supp. 756 (E.D.Va.1991); and, particularly, the *West One Bank*, 1994 WL 584723.

Skuld argues, based on the declaration of its Norwegian expert, Mr. Knudtzon, that although Section 51 of the Norwegian Maritime Code does not recognize a lien for necessaries, Section 75 of that Code states that Section 51 shall apply to liens on foreign vessels if invoked before a Norwegian court and Section 51 is not controlling on courts outside of Norway. (*See* Junge Decl., Exh. H.) Skuld then argues that no Norwegian maritime lien would be created because of the express restriction contained in Section 75, and stated, "[t]he court below thus read a non-existing provision into the insurance contract limiting Skuld to Norwegian maritime liens, and then read an explicit restriction out of the applicable Norwegian statute." (Appellant's Brief at 19.)

Skuld also argues, based on the opinion of its expert on Norwegian law, that because Norwegian law (Section 75) states that liens created under Norwegian law can only be enforced in Norwegian courts, Skuld's right to pursue liens in other jurisdictions is inherent in the Norwegian Maritime Code. Accordingly, Skuld argues that, since the issue of whether there was an inherent right under the law chosen in the contract to allow enforcement of foreign liens in other jurisdictions was not addressed in the cases relied upon by the Foreign Mortgagees, those cases are inapposite and do not support the decision of the Bankruptcy Court.

### Opinion

 Skuld's arguments misunderstand the federal choice of law principles relied on by Judge Blackshear and stated in *The Bremen* as applicable to transactions international in character and containing a choice of law provision like the insurance contract here. The Court in *The Bremen* looked to the agreement between the parties to determine whether a maritime lien arose under the law chosen by the parties and recognized that looking to the agreement between the parties was appropriate in both *in personam* and *in rem* actions. *See The Bremen,* 407 U.S. at 20, 92 S.Ct. 1907. Thus, the choice of law provision in the agreement of the parties governs, unless it would be "unfair, unjust or unreasonable" to hold the party to his bargain. *Id.* at 18, 92 S.Ct. 1907. As noted by Judge Blackshear, Skuld does not argue that provisions for Norwegian law contained in its Statutes and Rules and Certificates of Entry were unreasonable, unfair or unjust.

In *Roby,* 996 F.2d at 1360–1361, involving a contract containing choice of law and choice of jurisdiction provisions, the Second Circuit held, "[i]n the absence of other considerations, the agreement to submit to arbitration or the jurisdiction of the English courts must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum."

Similarly, the Court in *Sembawang Shipyard Ltd.,* 955 F.2d 983, sitting in admiralty, decided that any "dispute" arising from the transaction between a Singapore Shipyard and a Liberian owner for repair of the vessel will be governed by Singapore law because a provision in the contract required that Singapore law determine the repairer's rights against the vessel in actions *in rem* as well as against the owner *in personam.* *See also Liverpool and London Steamship Protection and Indemnity Association, Ltd. v. M/V Queen of Leman,* 296 F.3d 350 (5th Cir. 2002) (choice of law provision in contract governs maritime insurance contract).

Review of the cases relied on by Skuld does nothing to disturb this view of the applicable law. *Equilease Corp.,* 793 F.2d 598, was clearly not an international transaction case and there was no choice of law provision at issue. *The Flagship Group,*

*Ltd.,* 771 F.Supp. 756, also did not involve an international transaction or a choice of law provision in the contract.

In *North of England Protecting and Indemnity Association, Ltd.,* 1999 WL 33116416, a post-seizure hearing case, the Court merely made a *prima facie* or probable cause finding for the arrest of the vessel, stating that under U.S. law the plaintiff would have an enforceable maritime lien, but noted that, in making its decision on the dispute, an English arbitration panel may apply English law.

Skuld points out that in *Caterpillar Financial,* 1994 WL 468187, "Skuld itself was held to have a maritime lien for necessaries provided in the United States for unpaid premiums." (Appellant's Brief at 17.) This statement might suggest that Skuld has obtained relief in this country for liens for unpaid insurance premiums and calls despite the Skuld Statutes and Rules, and Skuld's Certificates of Entry requiring the application of the law of Norway. To so conclude would be error. The *Caterpillar Financial* opinion makes no mention of a choice of law provision in the insurance contract. As the Court pointed out in *Caterpillar Financial,* an insurer's Statutes and Rules may "contain different terms each year." 1999 WL 33116416 *5. Indeed, in *State Trading v. Assuranceforeningen Skuld,* 921 F.2d 409, 411 (2d Cir. 1990), the Magistrate Judge found that in 1988 Skuld's Statutes and Rules required the application of Norwegian law, but the 1983 provisions of those Statutes and Rules select the home country of the Member. *See id.* Accordingly, to base a deci-

sion here on the decision in *Caterpillar Financial,* would be folly.

In *West One Bank,* 1994 WL 584723, the Court held that insurance qualifies as a necessary, but then states that, although the insurer's Rules state the rules are subject to English law, the Rules do not cover liens, and that, accordingly, to determine "which nation's laws governs," it will apply the "greatest interest" rule, relying on *Lien Ho Hsing Steel Enterprise, Ltd. v. Weihtag,* 738 F.2d 1455 (9th Cir.1984). The Court in *West One Bank* misstates the holding in *Lien Ho. Lien Ho,* which involved a marine insurance claim, relied on the Supreme Court's holding in *The Bremen* that the choice of law provision in "a freely negotiated private international agreement, unaffected by fraud, undue influence or overweening bargaining power ... should be given full effect." *Lien Ho,* 738 F.2d at 1458, 1462.[5] The Ninth Circuit stated, "[t]he correct approach for a district court faced with a challenge to such a clause, is to enforce it unless the objecting party can make a strong showing that the forum selection clause is invalid or that its enforcement would be unreasonable or unjust." *Id.* at 1458. Accordingly, the approach followed by the District Court in *West One Bank* will not be followed here.

■ The contract between Skuld and Millenium, providing P & I insurance for the vessels, was a private international agreement. There are no claims of fraud, undue influence or overweening bargaining power. The contract documenting Skuld's Statutes and Rules and Skuld's Certifi-

---

**5.** Although *West One Bank,* 1994 WL 584723, utilized a greatest interest analysis, Judge Blackshear found that, even under such an analysis, Norwegian law should apply to this case. This Court will not affirm on that ground. The greatest contacts analysis is based on a different line of cases applicable in maritime tort cases and general maritime law, based on the decision in *Lauritzen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, which did not involve a choice of law provision in an international contract. However, even applying the greatest interest analysis, Judge Blackshear's decision is not erroneous since it is undisputed that Millenium's vessels traveled worldwide.

cates of Entry for each of the Millenium vessels membership in the club requires that the law of Norway be applied. *The Bremen,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513; *Roby,* 996 F.2d at 1353; *Sembawang Shipyard Ltd.,* 955 F.2d 983. Since both parties' experts on Norwegian law, Mr. Musaeus and Mr. Knudtzon, agree claims for unpaid insurance premiums do not create maritime liens under the law of Norway, Skuld's motion was properly denied and the Foreign Mortgagees' motion was properly granted.

The decision and order of Judge Blackshear entered August 1, 2002, granting the Foreign Mortgagees' motion for summary judgment and denying Skuld's motion for summary judgment is affirmed.

IT IS SO ORDERED.